SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

FRANKLIN ATLAS CORPORATION, John L. de Lyra, Walter Elmatti, Jack Gold, I. W. Page & Co., Inc., Defendants.

Civ. No. 120–172.

United States District Court
S. D. New York.
Aug. 16, 1957.

Paul Windels, Jr., Regional Adm'r, Walter D. Moran, Asst. Regional Director, John J. Devaney, Jr., Chief, Branch of Enforcement, Esther Antell, New York City, for Securities and Exchange Commission.

John J. McKenna, New York City, for defendants Jack Gold and I. W. Page & Co., Inc.

John T. Sullivan, New York City, for defendant Franklin Atlas Corp.

LEVET, District Judge.

This is a motion for a preliminary injunction restraining the defendants from offering to sell and selling shares of the common stock of the Franklin Atlas Corporation and from carrying or causing to be carried through the mails or in interstate commerce such securities for the purpose of sale or delivery after sale unless and until a registration statement is in effect.

The plaintiff in its complaint charges that the defendants are about to engage in acts and practices which constitute violation of certain sections of the Securities Act of 1933 (15 U.S.C.A. § 77q(a), et seq.).

The defendants are identified as follows: Franklin Atlas Corporation (hereinafter called Franklin) is a New York corporation with its principal office at 80 Wall Street, City, County and State of New York. John L. de Lyra is a resident of the County of Kings, New York, and is alleged to be in control of the management of Franklin. I. W. Page & Co., Inc. (hereinafter called Page) is a New York corporation with its principal office at 37 Wall Street, New York City, now registered as a broker-dealer in securities pursuant to Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o(b). Jack Gold is an officer and sole stockholder of Page. Walter Elmatti is a resident of Kings County, New York, and a son-in-law of Emanuel de Lyra, who is a brother of John L. de Lyra.

The complaint further alleges that since on or about April 1, 1956, the defendants have been and are now selling shares of Class A common stock of Franklin in interstate commerce and causing the same to be carried through the mails, and that no registration statement with respect to such securities is in effect with the Commission. The complaint also alleges that the defendants are making or causing to be made untrue statements of material facts and omitting to state material facts.

*First issue—misstatements.* Franklin reputedly is engaged in an attempt to erect an office building in the vicinity of Wall Street at the northeast corner of Wall and Pearl Streets; in the Borough

of Manhattan, City and State of New York. The alleged misstatements relate to property in this area. The facts in connection therewith will be hereinafter set forth.

*The second issue* is whether or not certain stock issued by Franklin (Tufaro stock) is or is not exempt from registration and is or is not controlled stock.

*The third issue* is whether or not Page and Gold should be subjected to preliminary injunction.

The particular misstatements set forth in the motion papers are as follows:

1. In a circular designated "Special Report," marked Exhibit A and attached to plaintiff's motion papers, the following statement appears:

"Major Project In Wall Street Area—The most important step of the company's present activities is centered around its current project which is the construction of a modern office building on Wall Street. A 33-story structure was originally planned. Now however, because of the tremendous inquiries and requests for space in the proposed building far exceeding the footage available, *Franklin Atlas is re-planning and negotiating for the acquisition of additional abutting land required to build a 55-story skyscraper.*" (Italics supplied.)

Apparently the plaintiff claims that the italicized portions are untrue.

2. Another bulletin in reference to Franklin, entitled, "An Investment in Real Estate Teamwork and Experience," Exhibit B attached to plaintiff's motion papers, contains, among other things, the following statements;

"* * * The new skyscraper will be built on Wall and Peal Streets with entrances on Wall, Pearl and Water Streets.

"* * * negotiations with the famous Angelo's Restaurant that made possible the acquisition of an adequate plot for the International Building are an excellent case in point."

3. An article published in The New York Times on May 6, 1956, which appears on the back of Exhibit B attached to the motion papers, states, among other things:

"A site has been assembled and plans have been completed for a thirty-three-story office building at the northeast corner of Wall and Pearl Streets. * * * It will have entrances on Wall, Peal and Water Streets.

* * * * * *

"The Pearl Street building, which was purchased by the Franklin Atlas Corporation from Angelo Calcagnini, * * *."

The facts with reference to Franklin's interest in property in the Wall Street area concerned herein are as follows:

1. On or about April 19, 1956, Franklin and the Estate of Angelo Calcagnini entered into a memorandum for the sale and purchase of premises at 160–162 Pearl Street at the price of $400,000. (See Exhibit A attached to affidavit of John L. de Lyra.) A more formal contract with respect to said premises was entered into by these parties on June 1, 1956.

2. On June 1, 1956, Angelo's Restaurant, which is adjacent to 80 Wall Street on the north, and Franklin entered into an agreement whereby Franklin agreed to purchase and Angelo's Restaurant agreed to sell certain equipment in and owned by said restaurant. (See Exhibit B attached to affidavit of John L. de Lyra.)

3. On April 12, 1956, the stockholders representing all of the issued and outstanding common and preferred stock of Anasae Realty Corporation (hereinafter called Anasae) as sellers, and Franklin as purchaser, entered into a contract for the sale of all of the stock of Anasae to Franklin at a purchase price of $1,000,-000. (See Exhibit F attached to affidavit of John L. de Lyra.) Anasae owns the premises at 80 Wall Street.

4. The McAuley Mission property, located to the northeast of the 80 Wall

Street property, fronting on Water Street, is also involved in the erection of the proposed skyscraper. Although Franklin has not entered into any contract for the purchase of this property, negotiations have been instituted with one Ludwig B. Armerding. This purchase in part depends upon securing another location for the Mission. (See Exhibit D attached to affidavit of John L. de Lyra.)

5. With respect to two other properties located nearby, it is conceded that up to the present time no steps towards acquisition had been made. John L. de Lyra states:

"* * * Between the McAuley Mission and 80 Wall were two small parcels which we considered would be easy enough to acquire at the proper time." (p. 8 of affidavit of June 21, 1957)

6. The Gerdau Building, which is contiguous to 80 Wall Street on the east, appears to have been the subject of discussion, but not the subject of a contract. Mr. Gerdau, the owner, first established the price of $1,500,000 for his property; later, the asking price was increased to $2,000,000.

Other activities of Franklin about which certain statements were made (see Exhibit B attached to plaintiff's motion papers) are as follows:

7. Franklin, in exchange for 81,670 shares of Class A stock issued to one Joseph Collaso, acquired title to three small parcels of real estate in Brooklyn, New York, 2146–2148 Beverly Road and 2145 Cortelyou Road. This property, according to John L. de Lyra, has a probable present value of over $50,000, subject to existing mortgages totaling $18,000.

8. As to the Fernway Residential Hotel at 118–120 Fenimore Street, Brooklyn, New York, the defendant John L. de Lyra says in effect that control of this property was obtained by Franklin through the issuance of 100,000 shares of Class A stock to Jamar Corporation in return for all of the outstanding stock of Virvin Corporation, which is the owner of the above-entitled premises. John L. de Lyra states that the market value of this property is in excess of $215,000, and has a mortgage debt aggregating $95,000. The assessed valuation is $68,000.

9. According to John L. de Lyra, Franklin took an assignment of a contract to purchase property in Bronxville, New York, from another buyer on January 24, 1956. There appears to have been some limitation of height under the zoning ordinance and, therefore, the contract was cancelled by the assignee. John L. de Lyra claims there is an understanding that if Franklin is successful in obtaining the zoning variation, the contract will be renewed promptly.

The facts with reference to the issuance of stock involved in the so-called alleged "control block" are as follows:

1. The initial authorized capital of Franklin was 500,000 shares of Class A stock with a par value of $1.00 a share, and 10,000 shares of Class B stock, having a par value of 50¢ a share. On June 14, 1955, the par value of the Class A stock was reduced to 10¢ a share and the number of authorized shares was increased from 500,000 to 5,000,000 shares. The par value of the Class B stock was reduced from 50¢ to 1¢ a share, and the number of authorized Class B stock was increased from 10,000 to 1,000,000 shares.

2. Joseph Collaso, in exchange for real estate in Brooklyn, New York, received 81,670 shares of the Class A stock. Each one of the eleven members of the Board received 500 shares, totaling 5,500 shares.

3. "J. L. de Lyra" paid in $4,000 for 400,000 shares of Class B stock. "J. L. de Lyra" is listed as secretary, treasurer and director of Franklin. "J. L. de Lyra" is Jane L. de Lyra, sister of John L. de Lyra.

4. On July 6, 1955, Franklin filed a Letter of Notification under Regulation A covering a proposed offering of $150,000 of 6% convertible debentures, 149,-

000 shares of Class A common stock at $1.00 a share, and 53,800 shares of Class B stock at 1¢ a share.

5. On April 6, 1956, Franklin reported that it was withdrawing the unsold balance of the offering and that as of March 31, 1956, it had sold one debenture, 104,-900 shares of Class A stock and 18,040 shares of Class B stock for a total of $106,080.40.

6. Of the 104,900 shares of Class A stock reported to have been sold, 75,000 shares were sold on March 30, 1956 to Walter Elmatti at $1.00 a share. Elmatti paid for these shares with a check which was returned by the bank for insufficient funds on April 2, 1956. The plaintiff claims that John L. de Lyra was the actual beneficial owner of such stock. John L. de Lyra, beginning on April 2, 1956, and continuing through August, 1956, made arrangements with broker-dealers to sell such stock to the extent of about 40,000 shares at prices ranging from 1⅜ to 1¾ a share. Some of the checks on such sale were paid to John L. de Lyra. On March 20, 1957, John L. de Lyra sold for the account of Elmatti 20,000 shares of Class A common stock at $1.25 a share to Jack Gold, apparently on credit. The records of Page show that between March 29, 1957 and May 1, 1957, Page sold a total of 15,100 shares of Franklin at 1¾ per share. These are part of the Elmatti 20,000 shares of Class A stock.

The Commission charges that these sales through Elmatti, reputedly by John L. de Lyra to Gold, were in violation of the registration and anti-fraud provisions of Sections 5 and 17(a) of the Securities Act of 1933, Title 15 U.S.C.A. §§ 77e and 77q(a).

Since the entry of a restraining order upon the initiation of this action, it is conceded that the defendants abandoned the intention to use any stock derived from Elmatti for delivery against the sales made by Page. Page seeks to use certain so-called "borrowed" shares. The Commission charges that Certificate No. 412 for 20,000 shares registered in the name of Walter Elmatti was delivered to Gold in connection with the sale to Gold and that out of these 20,000 shares sales to more than twenty individuals were recorded. The Commission claims that this method was an elastic device for the sale of stock outside of the terms of the Act. The stock "borrowed" by Page is reputedly owned by a Mrs. Virginia Tufaro, specifically Certificate No. 2003 for 20,000 shares, which the Commission claims the defendant John L. de Lyra delivered to Page in substitution for Elmatti's Certificate No. 412, which Page returned to Franklin. Mrs. Tufaro's certificate for 20,000 shares is based upon the arrangement above mentioned with Virvin Corporation, which, as stated, owned the building at 118 Fenimore Street, Brooklyn, New York. In exchange for 200 shares of Virvin Corporation stock, Franklin issued 100,000 shares of Class A stock to Jamar Corporation, the holder of the Virvin stock, and the Jamar Corporation distributed the stock to Mr. & Mrs. Frank J. Tufaro, the son-in-law and daughter of Emanuel de Lyra, John L. de Lyra's brother. This accounts for the 20,000 shares sought to be "borrowed" by Page.

The Commission charges that the May 7, 1957 meeting of the Board of Directors of Franklin, at which this arrangement was made, was of questionable validity, there being present only four of the eleven directors.

### 1. Mis-statements

Passing a newspaper report to customers with expressions indicating belief in it, and that they could and should rely on it, is sufficient to sustain liability for false or misleading statements about the stock in such newspaper report. Securities and Exchange Commission v. Macon, D.C., 28 F.Supp. 127, 130.

Moreover, as stated by Judge Irving R. Kaufman in Thiele v. Shields, D.C. S.D.N.Y.1955, 131 F.Supp. 416, 419:

" * * * the potential civil liability *for misrepresentations* under Section 12(2) appears to be much broader than that implied from Sec-

tion 17(a) (2). All that a plaintiff-purchaser need prove under Section 12(2) is that a statement in a prospectus or oral communication is *in fact* false or is a misleading omission, and that he did not know of such untruth or omission. The section expressly provides that the defendant must 'sustain the burden of proof that he did not know, *and in the exercise of reasonable care could not have known*, of such untruth or omission'. (Italics supplied.)"

In Holmes v. United States, 8 Cir., 134 F.2d 125, certiorari denied 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722, the court said:

"* * * Representations as to value, soundness and worth of securities may go so far beyond what may be considered the proper limits of the exaggerating enthusiasm of the normal salesman, or the mistaken judgment of the honest man, as to impress them with the badge or mark of fraud. McCutchan v. United States, 8 Cir., 70 F.2d 658; Busch v. United States, 8 Cir., 52 F.2d 79; Foshay v. United States, 8 Cir., 68 F.2d 205; Stephens v. United States, 9 Cir., 41 F.2d 440. * * *" 134 F.2d at page 133.

The Securities Act is violated upon the mere mailing of letters containing misrepresentations even if the recipient is not deceived. Bobbroff v. United States, 9 Cir., 1953, 202 F.2d 389.

### 2. Control

John L. de Lyra, it is true, is not and was not a director, officer or stockholder of Franklin. He was manager and he did exercise control over the operations, publicity, attempts to assemble real estate parcels, and the issuance of stock to Collaso, to Jamar Corporation, to Elmatti and his assigns, to Tufaro and others.

The Tufaro stock, Certificate No. 2003 for 20,000 shares, was obtained from John L. de Lyra by Page. Although the Franklin Board had eleven directors, only four directors at most attended the meeting on May 7, 1957, when the arrangement to issue the stock was made. The Virvin Corporation owned a rooming house at 118 Fenimore Street, Brooklyn, New York, which Emanuel de Lyra operated. The stockholders of Virvin were Mr. & Mrs. Frank J. Tufaro, son-in-law and daughter of Emanuel de Lyra.

"Control" is defined as follows:

"The term 'control' (including the terms 'controlling', 'controlled by' and 'under common control with') means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 Code of Fed.Reg. § 230.-405(f).

In Thompson Ross Securities Co., 6 S.E.C. 1111, 1119, it is stated:

"The question of 'control' is a factual question. 'Control' is not synonymous with the ownership of 51 percent of the voting stock of a corporation. Where power exists to direct the management and policies of a corporation, 'control' within the meaning of Section 2(11) exists even though the persons who possess that power do not own a majority of the corporation's voting stock. See H.R. 85, 73d Cong., 1st Sess., p. 12; United States v. Union Pacific R. Co., 1912, 226 U.S. 1 [sic, p. 61], 33 S.Ct. 53, 57 L.Ed. 124; Natural Gas Pipeline Co. v. Slattery, (1937) 302 U.S. 300, 58 S.Ct. 199, 82 L.Ed. 276; Rochester Telephone Corp. v. United States, (1939), 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147."

This court is concerned in this case only with facts on which proof is satisfactory. References to the "mass of evidence," which the Commission may have but does not submit, are not impressive. Pertinent excerpts from such ultimate evidence are worth more than a ream of conclusory allegations.

The factual statements herein summarized and other facts which appear in the Commission's papers indicate control by John L. de Lyra. The prerogatives of Jane de Lyra (J. L. de Lyra) appear to have been exercised. She acquiesced in John's operations.

I conclude that John L. de Lyra was in actual control.

█ The burden of proof of an exemption from registration is upon the issuer. Security and Exchange Comm. v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494.

### 3. Page and Gold

█ There is no evidence that either Page or Gold was, prior to a visit of a representative of the Commission early in May, 1957, affirmatively aware of any infirmity in the sale of Elmatti shares under Certificate No. 412. There is no indication that Page or Gold contemplate selling these shares. In fact, the contrary appears. They now appear to be seeking to "borrow" the Tufaro shares (Certificate No. 2003) since Gold and Page are "short" 14,250 shares.

Title 15 U.S.C.A. § 77t(b) is as follows:

"Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, it may in its discretion, bring an action in any district court of the United States, United States court of any Territory, or the United States District Court for the District of Columbia to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General who may, in his discretion, institute the necessary criminal proceedings under this subchapter. Any such criminal proceeding may be brought either in the district wherein the transmittal of the prospectus or security complained of begins, or in the district wherein such prospectus or security is received."

I do not believe that defendants Gold or Page should be enjoined here from the sale of the Elmatti stock since there is no indication that they are about to do so. The Commission has not demonstrated that the conduct of Page and Gold as to the sale of the Elmatti stock was subject to reproach or that a sale by Page or Gold impends. See United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303; Securities and Exchange Commission v. Torr, 2 Cir., 1937, 87 F.2d 446.

When Gold became interested in selling 20,000 shares of the Elmatti stock he demanded proof from Franklin and Elmatti that these shares were exempt from registration. He obtained copies of the offering circulars. He obtained a statement, dated March 19, 1957, from Elmatti. Gold's company, Page, obtained a statement from Franklin concerning its supposed real estate interests. John L. de Lyra brought Elmatti to Gold's office and Gold gave Elmatti his note for $30,000 with the understanding that the note would be paid as the stock was sold. When the Commission indicated that this stock was of questionable source, Gold demanded "free" stock.

On May 14, 1957, Gold received Certificate No. 2003 for 20,000 shares of Franklin from Mrs. Virginia Tufaro, who had apparently received the stock as hereinafter set forth. Under date of May 16, 1957, Gold received from his attorney, Edward J. Gedalicia, an opinion that said shares were exempt.

There is no indication that either Page or Gold contemplates selling any of the Franklin stock. They appear to have readily obeyed all mandates of the Commission.

When the likelihood of the resumption of the acts complained of do not in reason exist, justification for such drastic

**402**

action as the issuance of a preliminary injunction is lacking, since there is in fact no lawful purpose to be served. Securities and Exchange Commission v. Lawson, D.C.D.Md., 1938, 24 F.Supp. 360, 363; Securities and Exchange Commission v. Torr, 2 Cir., 1937, 87 F.2d 446, 450.

Accordingly, I conclude that no preliminary injunction should issue against Page or Gold.

Accordingly, the motion of plaintiff brought on by order to show cause of May 9, 1957, to the extent granted in the temporary restraint order contained therein, is granted as against defendants Franklin Atlas Corporation, John L. de Lyra and Walter Elmatti, but denied as to defendants Jack Gold and I. W. Page & Co., Inc.

Settle order on notice.