## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

## S. Mort ZIMMERMAN, Defendant.

### Civ. A. No. 74–1711.

United States District Court,
District of Columbia,
Civil Division.

Jan. 27, 1976.

David H. Belkin, Robert E. Grossman, Richard L. Osborne, S.E.C., Washington, D. C., for plaintiff.

Irving R. M. Panzer, Washington, D. C., Dean Carlton, Dallas, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### *Findings of Fact*

PRATT, District Judge.

1. Savoy Industries, Inc. (Savoy) is a private corporation organized under the laws of the State of Delaware, with its general offices at 24–15 43rd Avenue, Long Island City, New York, primarily engaged in the business of making and installing plastic processing equipment, manufacturing of cosmetics and toiletries, the operation of cemeteries, and real estate operations in Canada and on Grand Bahama Island. (Tr. 86, 161) Defendant Savoy has approximately 1,113,000 shares of its $.25 par value common stock outstanding. (P's Ex. 20) Such shares are listed on the American Stock Exchange. (Tr. 163–64) Savoy is subject to the reporting requirements of the Securities and Exchange Commission.

2. Interstate General, Inc., (Interstate) is a private corporation organized under the laws of the State of Texas, with its offices at 530 Blanton Towers, 3300 W. Mockingbird Lane, Dallas, Texas. It has no reporting requirements to the Securities and Exchange Commission. (Tr. 443–44, 526)

3. S. Mort Zimmerman (Zimmerman) resides at 3530 Forest Lane, Suite 93, Dallas, Texas. He is a substantial stockholder in a number of corporations, and he is President and Chairman of the

Board of Intercontinental Industries, Inc., (Intercontinental) a company whose stock was formerly traded on the American Stock Exchange. In 1969, Zimmerman was permanently enjoined by the U. S. District Court for the Southern District of New York from violating Section 17 of the Securities Act, 15 U.S.C. § 77q(a) and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5 thereunder, in connection with the publication and dissemination of press releases, brochures and other written and oral statements concerning Prebuilt Homes, Inc. and Intercontinental Industries, Inc. (Tr. 329–32, 336–37; P's Exs. 14, 16) On January 4, 1972, after an indictment was returned in October 1971 before the U. S. District Court for the Southern District of Florida, Zimmerman was fined $30,000 and placed on five years probation on a plea of guilty to three counts of securities fraud and one count of mail fraud in connection with State Fire and Casualty Co., a Miami, Florida insurance company, which subsequently became insolvent. (P's Ex. 13)

4. Phillip H. Weinkrantz (Weinkrantz) resides at 2711 Throckmorton Street, Dallas, Texas. At all times hereto, Weinkrantz was Vice President and Director of Interstate. (Tr. 67, 75, 203) He was also President and a Director of Savoy beginning on or about April 18, 1974 until September 18, 1974, a period of 153 days. (Tr. 35)

5. Lee Mansdorf (Mansdorf) resides in Beverly Hills, California, and, through the Mansdorf Trust, a family trust, is primarily engaged in the business of real estate. (Tr. 239–40, 297)

*Phase I—Southwestern National, Inc.*

6. Zimmerman, in 1969 or 1970, joined Donald Mopsick (an attorney in Dallas) and Leon Zetley (an investor in Dallas) in the purchase of common stock of a small life insurance company in Dallas named States General Life Insurance Company (States) (Tr. 340–41), a company in excellent financial condition. (Tr. 60–61) They continued to purchase States stock until about February, 1973,

at which time Zimmerman owned 11,046 shares. (Tr. 340–42)

7. Zimmerman, Mopsick and Zetley, about the year 1970, organized a corporation called Southwestern National, Inc. for the purpose of making it a vehicle to acquire (either by acquisition or through a tender offer) additional shares of States. (Tr. 343–45) Through their attorney, Edward Peterson, they made proposals in the name of Southwestern National, Inc., but those proposals were not accepted and subsequently the proposals were abandoned. (Tr. 344–45)

*Phase II—The Formation of Interstate General, Inc.*

8. The rejection of the Southwestern National proposals left Zimmerman with 11,046 shares of States, the second largest block of States stock. The stock had a very thin public market, and a block of that size could not be sold without a substantial decrease in market price. Zimmerman considered his shares of States, for which he had invested close to $40,000, frozen, unless he could use them to acquire control of States itself. (Tr. 355–56)

9. Therefore, Zimmerman developed another plan for acquiring control of States. (Tr. 58) According to the plan discussed at a meeting in 1972, Zimmerman, together with Weinkrantz and a Charles Holman, a Dallas insurance man, would form a new company, Interstate General, Inc. (Interstate). Zimmerman would transfer his 11,046 shares of States to Weinkrantz who, in turn, would place them into Interstate. (Tr. 57–58) Interstate would then make a new tender offer for the common stock of States. (Tr. 39, 45)

10. Zimmerman and Weinkrantz are long-time friends. They have known each other for some 36 years. (Tr. 37, 339) However, Weinkrantz is clearly Zimmerman's inferior in business affairs. (Tr. 36, 363–64) Weinkrantz's entire past business experience was as a salesman of insurance and real estate. (Tr. 34–36) At one point, Zimmerman asked Weinkrantz if he would like to be president of

an insurance company. Weinkrantz responded that he had no managerial experience and that he did not think that he was capable of running an insurance company. (Tr. 61–62) In 1971 or 1972, Weinkrantz had become, at the request of Zimmerman, a member of the Board of Directors of International, of which Zimmerman was still President and Chairman of the Board.

11. Interstate was incorporated in March of 1973. (Tr. 38) Charles Holman was named President and Weinkrantz was named Vice President. (Tr. 179–83; D's Ex. 1) The directors were Holman, Weinkrantz, Charles Connolly, an actuary, James R. Alexander, a lawyer, and Sidney Lynn, a business consultant. (Tr. 74) Zimmerman was not named either as a director or as an officer of Interstate. The total issue of Interstate was 500,000 shares.

12. Pursuant to the plan, Zimmerman transferred his 11,046 shares of States stock to Weinkrantz, in return for which Weinkrantz gave Zimmerman a promissory note for $88,368, representing a value of $8.00 per share. (Tr. 193) Zimmerman had paid only $4.00 a share for the stock, and Weinkrantz was aware of that fact. (Tr. 193, 365–67) The market value for the stock was $3.75 to $4.00 per share.

13. Weinkrantz, upon their receipt from Zimmerman, transferred the 11,046 shares of States into Interstate and was issued 400,000 shares of Interstate in exchange. Weinkrantz, in turn, pledged the 400,000 shares of Interstate to Zimmerman as collateral to secure the $88,368 note. (Tr. 56–57, 359–60) These 400,000 shares of Interstate are currently in the custody of Zimmerman. (Tr. 47)

14. Weinkrantz's estimated net worth at the time he received the States stock from Zimmerman was approximately $40,000 to $50,000. Weinkrantz could not then and cannot now pay off the $88,368 note to Zimmerman. The note, plus accrued interest, is currently outstanding to Zimmerman. (Tr. 59–60) The original copy of this note was torn up by Weinkrantz in the presence of and after discussion with Zimmerman after receipt of the Commission subpoena respecting the Savoy investigation. In July, 1974, a new note dated March 16, 1973 and payable in seven years, was typed by Zimmerman's secretary and executed by Weinkrantz.

15. The remaining 100,000 shares of Interstate were issued to persons Zimmerman knew or was associated with as a purported finder's fee and for purported services rendered. (Tr. 187–88) Weinkrantz received 17,850 shares. (Tr. 186–87) Also among those receiving shares were Trans-Exchange Corporation, a Zimmerman holding company, and one Mort Tanzer. Weinkrantz did not know why Trans-Exchange was entitled to any shares, but knew only that Zimmerman had told him that the corporation deserved a finder's fee. (Tr. 216–17) Similarly, Weinkrantz did not know Tanzer, and he did not know what services Tanzer had rendered. Nevertheless, at Zimmerman's suggestion, Tanzer was paid a finder's fee of 14,575 shares of Interstate. (Tr. 217) Holman, Lynn, Alexander and Joseph Shoaf were among others who were recipients of Interstate shares. (Tr. 217)

16. The offices of Interstate were located in Dallas in a back room in Zimmerman's suite of offices. (Tr. 68) Interstate used Zimmerman's telephones, office facilities, including copying machine and secretarial services. (Tr. 68) Interstate's accounting reports and tax returns were prepared by an accountant who was an employee of Zimmerman and who was suggested by Zimmerman. (Tr. 131–33) Interstate never paid for the services of this accountant, and it is readily to be inferred that Zimmerman paid for them. Zimmerman also provided Interstate with a cash advance of over $4,000 to cover additional expenses for such things as travel and postage. The advance was never evidenced by a note. (Tr. 69–70) Zimmerman also provided ideas for the operation of Interstate, and Weinkrantz sought Zimmerman's help when the company had any problems. (Tr. 73) At all times relevant

hereto, Zimmerman was in control of Interstate.

17. Interstate was unable to secure the capital or assets necessary to implement Zimmerman's plan for the acquisition of States stock. (Tr. 78–79)

*Phase III—The Savoy Transaction.*

18. In August of 1973, Weinkrantz met with Zimmerman to discuss Interstate's unsuccessful efforts to raise capital and acquire assets. (Tr. 77) During the meeting Zimmerman called Louis Danenberg, President of Savoy. (Tr. 77) Zimmerman had had a long relation with Savoy, being a large stockholder, and had been associated with Danenberg in various matters since 1960. (Tr. 516–17) Zimmerman told Danenberg about Interstate's unsuccessful efforts to acquire capital and assets to finance the tender offer for States stock and suggested that Savoy might want to diversify into life insurance. (Tr. 394)

19. Danenberg was advancing in years, was ill and was eager to terminate his official position with Savoy. (Tr. 397–98) Danenberg was also interested in causing enough new shares of Savoy to be issued so that his holdings would be diluted to the point where he could not be considered a control person of Savoy subject to SEC reporting requirements. (Tr. 82, 394–95)

20. Danenberg was interested in making an arrangement on behalf of Savoy whereby Interstate would contribute its 11,046 shares of States stock in exchange for an issuance of Savoy stock. However, he wanted additional assets in the transaction to insure that enough new shares of Savoy stock would be issued to dilute sufficiently his own holdings. (Tr. 82)

21. Zimmerman suggested that real estate would be the type of additional asset that Interstate could use for the transaction, and it was also suggested that the real estate must have a value in excess of $750,000 (subsequently the val-

ue actually used in the transaction was $468,000) to be acceptable in the exchange for Savoy stock.* (Tr. 85, 117–19) He further suggested that California land owned by Mansdorf could be that real estate. (Tr. 88)

22. Previously, in mid-1972, Zimmerman had attended a meeting in his Dallas office at which he, Mansdorf and Danenberg discussed the possibility of Mansdorf putting some of his real estate into Savoy in exchange for Savoy stock. (Tr. 239–41) The meeting had been arranged by Mort Tanzer. (Tr. 241) No agreement was reached at that meeting, and subsequent proposals by Danenberg were rejected by Mansdorf. (Tr. 244–46)

23. In mid-October, 1973, Mansdorf attended an important meeting in Dallas, Texas, in Zimmerman's office, with the directors of Interstate, i. e., Weinkrantz, Alexander, Lynn and Holman, as well as Danenberg and Zimmerman. (Tr. 95, 248) Mansdorf agreed to a transaction in which he would exchange the real property in Glendale, California, for 100,000 shares of Savoy. (Tr. 252–53) Subsequently, a friend of his, William Dunlap, agreed to put up $52,000 in cash for an additional 30,000 shares of Savoy. (Tr. 253)

24. At about the same time Zimmerman purchased an additional 955 shares of States from Mopsick and Zetley in order to round off the block of Savoy to 12,000 shares. (Tr. 370) In fact, the shares totaled 12,001. Zimmerman transferred these 955 shares to Weinkrantz who, in turn, placed them into Interstate. (Tr. 44) No note or other consideration has ever been given by Weinkrantz to Zimmerman for these shares. (Tr. 45)

25. On or about February 11, 1974, Savoy, pursuant to Section 13 or 15(d) of the Exchange Act, filed a Form 8–K report with the S.E.C. describing the purported facts relating to the sale of said 172,000 shares of Savoy stock. (P's Ex.

---

* A subsequent appraisal of this property dated October 17, 1974 indicated a value of $87,500. (P's Ex. 9)

21) This Form 8–K did not mention Zimmerman.

26. On or about February 12, 1974, Savoy filed an application with the American Stock Exchange for the listing of 172,000 shares of Savoy stock to be issued to Interstate, Mansdorf and Dunlap. (P's Ex. 22) That application for listing did not mention Zimmerman.

27. On April 5, 1974, pursuant to the plan agreed upon at the mid-October, 1973 meeting in Dallas (see ¶ 23), 172,000 shares of Savoy, representing 15.45% of the outstanding common stock of Savoy, were issued to Interstate (42,000), Mansdorf (100,000) and Dunlap (30,000) in exchange for the 12,001 shares of States, the 117 acres of land in Glendale, California, and the $52,000. (Tr. 379) In addition, Weinkrantz, prior to this time and at Zimmerman's direction, purchased Savoy stock in his (Weinkrantz's) name with funds supplied by Zimmerman.

28. On or about April 5, 1974, a letter, pursuant to Section 14(f) of the Exchange Act, was sent to Savoy stockholders notifying them of the change in the majority of directors. (P's Ex. 24) The letter described the facts relating to the issuance of the 172,000 shares. It did not mention Zimmerman.

29. On April 18, 1974, three of the four directors of Savoy, as well as the President, Danenberg, resigned their positions with the company. (Tr. 153) In their places, and at a meeting held in Dallas, Weinkrantz was elected President of Savoy, and the new directors were Weinkrantz, Sidney Lynn and Thomas Fortescue, III, an attorney who had done legal work for Zimmerman in the past. (Tr. 153)

30. Zimmerman participated in discussions which led to the selection of the new members of the Board of Savoy. (Tr. 151) All the new directors were known to Zimmerman. Weinkrantz suggested that a Cecil Elfenbein be named to the Board, but Elfenbein was rejected precisely because he was not known to Zimmerman. (Tr. 152)

31. Zimmerman participated in discussions which led to the designation of Danenberg as a $25,000 a year consultant to Savoy. (Tr. 97–100)

32. Weinkrantz knew he was in over his head as President of Savoy, and he depended heavily on Zimmerman. He regarded Zimmerman as his helpmate. (Tr. 120)

33. Thorp and Thompson were named as accountants for Savoy at Zimmerman's suggestion. (Tr. 160)

34. Zimmerman interceded in a conflict regarding the question of necessary signatures on Savoy's corporate checks. (Tr. 157) The decision as to who would sign the corporate checks arose out of a meeting between Zimmerman, Weinkrantz and Danenberg. (Tr. 159)

35. Weinkrantz was in Zimmerman's office when he prepared information required to be submitted to the S.E.C. in connection with the Interstate-Savoy transaction. At that time Weinkrantz inquired of Zimmerman, "What is an issuer?" Zimmerman responded, "That's Savoy." (Tr. 148–150)

36. At all times relevant hereto, Zimmerman was in control of Savoy.

37. On or about April 10, 1974, a Schedule 13–D statement of information required by Section 13(d) of the Exchange Act and Rule 13d–1 was filed in connection with the Interstate-Savoy transaction. The statement, in describing the group which purchased the 172,-000 shares of Savoy stock as consisting of Interstate, Dunlap's corporation and Mansdorf (on behalf of his family trust) purported to set forth the identity and background of the purchasers, the source and amount of the funds and the purpose of the transaction. Zimmerman was nowhere mentioned in that Schedule 13–D statement. (P's Ex. 23)

38. On or about May 24, 1974, Savoy, pursuant to Section 13 or 15(d) of the Exchange Act, filed a Form 10–K report with the S.E.C. for the fiscal year ending December 31, 1973, describing the Interstate-Mansdorf-Dunlap transaction. (P's Ex. 20) Zimmerman was not mentioned in that report.

39. In the spring of 1974, the stock of Savoy tumbled below $1.00. (Tr. 166) The American Stock Exchange suspended trading and the S.E.C. began an investigation. Ultimately, Weinkrantz and the rest of the Board terminated their relationship with Savoy. (Tr. 165)

40. The means and instrumentalities of interstate commerce and the mails and national securities exchanges were used in connection with the aforementioned activities.

### Conclusions of Law

1. This Court has subject matter jurisdiction over the present action pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

2. Under Section 13(d)(1) of the Exchange Act (15 U.S.C. § 78m(d)(1) and Rule 13d–1 (17 CFR 240.13d–1) promulgated thereunder, any person who becomes a direct or indirect owner of more than 5% of any class of stock of a company through a stock acquisition must file with the Commission and send to each stock exchange where the stock is traded, a statement setting forth the information contained in Schedule 13D including, among other things:

   (a) the background and identity of all persons by whom or on whose behalf purchases were effected, including whether during the last 10 years such person has been convicted in criminal proceedings;

   (b) the nature and source of the consideration used in making the purchase; and

   (c) any anticipated changes in business or corporate structure.

3. Under Section 13(d)(3) of the Exchange Act, when two or more persons act as a group for the purpose of acquiring securities, such group is deemed a "person" under Section 13(d) of the Exchange Act and Rule 13d–1 promulgated thereunder, and the background and identity of all members of the group must be disclosed.

4. Under Note A to Schedule 13D, the statement filed under Section 13(d) and Rule 13d–1 must contain a description of the background and identity of any person who controls any member of a group which becomes an owner of more than 5% of the stock of a company.

5. "Control" of a member of a group for purposes of Note A to Schedule 13D, can be defined as the power, direct or indirect, to cause the direction of that member's management and policies, "whether through ownership of voting securities, by contract, *or otherwise.*" (Emphasis added) Rule 405 promulgated pursuant to the Securities Act (17 CFR 230.405(f)) and Rule 12b–2 promulgated pursuant to the Exchange Act (17 CFR 240.12b–2). The "or otherwise" clause encompasses situations where persons control the operation of companies through their activities even though they may not even be shareholders, *Stadia Oil & Uranium v. Wheelis*, 251 F.2d 269 (10th Cir. 1957), and in some instances even where they are not shareholders, officers, or directors. *SEC v. Franklin Atlas Corp.*, 154 F.Supp. 395 (S.D.N.Y. 1957) The actual power to cause the direction of a corporation's management or policies even though it is by the sufferance of another person or persons who possess the ultimate voting power is the equivalent of control. *North County Uranium and Minerals, Ltd.*, 37 SEC 608, 613 (1957); *M. A. Hanna Co.*, 10 SEC 581, 589 (1941).

6. Under Section 13(a) of the Exchange Act (15 U.S.C. § 78m(a)) and Rules 13a–1 and 13a–11 promulgated thereunder (17 CFR 240.13a–1 and 13a–11), public companies must file annual reports under Form 10–K and, when significant events occur, current reports under Form 8–K. Savoy is such a public company.

7. Under Section 14(f) (15 U.S.C. § 78n(f)), Rule 14a–3(a) promulgated thereunder (17 CFR 240.14a–3(a)) and Item 6 of Schedule 14A thereunder, when directors constituting a majority are elected or designated otherwise than at a meeting of stockholders, the compa-

ny must file with the Commission and transmit to the stockholders information concerning, among other things, the identity and background of such directors, and any understandings or side arrangements they may have with others, pursuant to which they were designated or elected.

8. Under Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)) and Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 promulgated thereunder (17 CFR 240.10b–5), it is unlawful for any person in connection with the offer, purchase or sale of any security to (1) employ any device, scheme or artifice 'to defraud, (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (3) engage in any act, practice or course of business which operates as a fraud, or (4) obtain money or property by means of a false statement.

9. Material facts are those which a reasonable investor might consider important in the making of an investment decision. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

10. Based on the above findings of fact, a group was formed which consisted of, among others, Interstate, Mansdorf and a third party. Numbered among those persons who controlled Interstate and for whom there was no disclosure, as is required, was Zimmerman.

11. In addition to the fact that Zimmerman should have disclosed that he was a control person of Interstate, Zimmerman should also have disclosed his role as a member of the group consisting of Interstate, Mansdorf and the third party that acquired control of Savoy.

12. Since Zimmerman was both a member of the group (Interstate, Mansdorf and Dunlap) and controlled another member of the group (Interstate), he, either separately or as part of that group, was required to file a report with the Commission under Section 13(d) and 13(d)(3), Rule 13d–1 and Schedule 13D, including Note A, and such report had to contain true and accurate information of the type described in those provisions.

13. Zimmerman violated Sections 13(d)(1) and 13(d)(3) and Rule 13d–1 promulgated thereunder in that he failed to file any form which contained the information required to be filed by persons who acquire control of a public company.

14. Zimmerman violated and aided and abetted violations of Sections 10(b), 13(d)(1) and 13(d)(3) of the Exchange Act, Rules 10b–5 and 13d–1, and Section 17(a) of the Securities Act in that the Schedule 13–D, which was filed on April 10, 1974 by the group of which he was a member and which he controlled, was false and misleading and omitted to state material facts required to be included therein and necessary to make the statements made not misleading.

15. Zimmerman violated Sections 10(b) and 13(a) of the Exchange Act, Rules 10b–5, 13a–1 and 13a–11 thereunder, and Section 17(a) of the Securities Act in that the Form 8–K report filed on February 11, 1974 for the month of January, 1974 by Savoy, which at that time was under the control of Zimmerman's group, and the Form 10–K report filed on May 24, 1974 for the fiscal year ended December 31, 1973 by Savoy, which at that time was under the control of Zimmerman's group, were materially false and misleading and omitted to state facts necessary to make the statements made not misleading.

16. Zimmerman violated Section 10(b) of the Exchange Act, Rule 10b–5 thereunder, and Section 17(a) of the Securities Act in that the April 5, 1974 letter sent to shareholders pursuant to Section 14(f) of the Exchange Act by Savoy, which at that time was under the control of Zimmerman's group, was materially false and misleading and omitted to state facts necessary to make the statements made not misleading.

17. Zimmerman violated Section 10(b) of the Exchange Act, Rule 10b–5 thereunder, and Section 17(a) of the Securities Act in that the American Stock Ex-

change listing application filed on or about February 12, 1974 by Savoy, which at that time was under the control of Zimmerman's group, was materially false and misleading and omitted to state facts necessary to make the statements made not misleading.

■ 18. On the above basis of the above findings of fact and conclusions of law, this Court concludes that plaintiff Commission is entitled to a permanent injunction against defendant Zimmerman for future violations of Section 17(a) of the Securities Act of 1933, Sections 10(b), 13(a) and 13(d) of the Securities Exchange Act of 1934, and Rules 10b–5, 13a–1, 13a–11 and 13d–1 thereunder.

An Order consistent with the foregoing has been entered this day.

### JUDGMENT OF PERMANENT INJUNCTION AND OTHER RELIEF

Plaintiff Securities and Exchange Commission, having filed a complaint for injunction and other relief and the Court having heard a trial on the merits of this matter on October 22 and 23, 1975, and for the reasons assigned in the Court's Findings of Fact and Conclusions of Law filed on January 27, 1976,

It is ordered, adjudged and decreed, that defendant S. Mort Zimmerman (Zimmerman), his agents, servants, partners, assigns and those persons in active concert or participation with them, are hereby restrained and enjoined from, directly or indirectly, in connection with the offer, purchase or sale of securities of Savoy Industries, Inc. (Savoy) or any other issuer, making use of the means or instrumentalities of interstate commerce or of the mails to employ any device, scheme or artifice to defraud, to make any untrue statements of material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person; and it is further

Ordered, adjudged and decreed, that defendant Zimmerman, his agents, servants, partners, assigns and those persons in active concert or participation with them, are hereby restrained and enjoined from directly or indirectly filing or causing Savoy or any other company to file any annual, periodic or other reports with the Securities and Exchange Commission containing untrue statements of material facts or omitting to state material facts necessary to make the statements made in light of the circumstances under which they were made, not misleading or to omit information required to be stated therein, and from failing to file or causing the failure to file said reports on a timely and current basis; and it is further

Ordered, adjudged and decreed, that defendant Zimmerman file with the Securities and Exchange Commission within thirty (30) days from the date of this Order a Schedule 13D report containing an accurate description of his involvement in the acquisition of 172,000 shares of Savoy common stock from Savoy; and it is further

Ordered, adjudged and decreed, that defendant Zimmerman, his agents, servants, partners, assigns and those persons in active concert with them, are hereby restrained and enjoined, from voting any of the shares of Savoy common stock acquired by them or their nominees in connection with the agreement entered into by Savoy, Interstate General, Inc., Lee Mansdorf and others.