## SECURITIES AND EXCHANGE COMMISSION

v.

## SAVOY INDUSTRIES, INC., et al.

### Appeal of S. Mort ZIMMERMAN.

### No. 76–1490.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 20, 1977.

Decided July 14, 1978.

Rehearing Denied July 28, 1978.

Irving R. M. Panzer, Washington, D.C.; Dean Carlton, Dallas, Tex., was on the brief for appellant.

David Ferber, Sol., S. E. C., Washington, D. C., with whom Daniel L. Goelzer, Sp. Counsel, and Lawrence A. Horn, Atty., S. E. C., Washington, D. C., were on the brief, for appellee.

Before McGOWAN, TAMM and ROBINSON, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

This case arises out of the plaintiff-appellee Securities and Exchange Commission's (SEC or Commission) successful injunctive action against defendant-appellant S. Mort Zimmerman in the United States District Court for the District of Columbia. The Findings of Fact and Conclusions of Law awarding an injunction to the Commission are reported as *SEC v. Zimmerman*, 407 F.Supp. 623 (D.D.C.1976). Appellant raises challenges to the district court's decision not to transfer this action under 28 U.S.C. § 1404(a) (1970), and to its findings and conclusions on the merits. We shall treat the issues in that order.

## I. THE TRANSFER MOTION

### A. *Background*

The Commission commenced this action through a Complaint for Injunctive and Other Relief dated November 22, 1974. Named as defendants were Savoy Industries, Inc. (Savoy), Philip Weinkrantz, Interstate General, Inc. (Interstate), Lee Mansdorf, Anthony Damato, and appellant Zimmerman.[1] The Commission alleged that Zimmerman participated in a scheme with the other defendants to gain control of Sa-

---

1. Joint Appendix (J.A.) at 10.

voy, which was publicly traded on the American Stock Exchange. According to the Commission, this control of Savoy was to be used, in turn, to gain control of one or more insurance companies. In the alleged realization of this scheme, five documents were filed or disseminated by Savoy and others. Zimmerman was charged with violations of certain reporting and anti-fraud provisions of the federal securities laws in connection with these documents.[2]

Appellant, a resident of Dallas, immediately made a pro se motion to dismiss, or to transfer to the United States District Court for the Northern District of Texas in Dallas under 28 U.S.C. § 1404(a). The Commission opposed the motion, stating that "a majority of the plaintiff's witnesses in this action are located in the New York metropolitan area, the corporate officers of Savoy and all its records are in New York [footnote omitted]."[3] Zimmerman's motion was denied without comment on January 15, 1975.[4] Following this denial, all defendants except Zimmerman either consented to permanent injunctions or defaulted, so that, by July 18, 1975, appellant was the sole defendant in the case.[5]

Two months later, on September 19, at a hearing on a repeat status call, Zimmerman's counsel sought leave to have the case transferred or dismissed. In its denial, the district court noted that, "we have spent a certain amount of time on this case. We are familiar with it. It is ready for trial."[6] A non-jury trial date was set for October 22, 1975.[7]

One week before trial was scheduled to begin, appellant's counsel once again sought a transfer to Dallas, arguing that "new facts have appeared that make it clear as a bell that this case has no real business being tried in Washington." Joint Appendix (J.A.) at 75. The new development, as alleged by counsel for appellant, was that the Commission intended to call only three witnesses: one from California, one from Dallas, and one from New York.[8] Zimmerman, through his counsel, suggested that there were fifteen witnesses "who could appear for him," id. at 77, all of whom were located in Dallas. He maintained that he was financially unable to bring these witnesses from Dallas,[9] and that his right to a fair trial had been jeopardized.[10] By order of October 16, 1975, the district court denied the appellant's renewed motion to transfer.[11]

## B.  *The Decision Not to Transfer*

Appellant first argues that, after the hearing of October 15, 1975, the district court should have exercised its discretion to transfer the case to Dallas. *See* Brief for Appellant at 21–37. The relevant statute, 28 U.S.C. § 1404(a) (1970), provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." This section applies to actions governed by special venue provisions, *Ex parte Collett*, 337 U.S. 55, 58–59, 69 S.Ct. 944, 93 L.Ed. 1207 (1949); *see Continental Grain Co. v. Barge FBL–585*, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960), including the special venue provisions of the federal securities statutes, *see Wyndham Associates v. Bintliff*, 398 F.2d 614 (2d Cir.), *cert. denied*, 393 U.S. 977, 89 S.Ct. 444, 21 L.Ed.2d 438 (1968). *See also United States v. Na-*

2.  *Id.* at 10–24.

3.  *Id.* at 27.

4.  *Id.* at 28.

5.  On January 28, 1975, defendants Weinkrantz and Interstate consented to permanent injunctions. Record entry (R.E.) 13. Savoy settled on May 9, *id.* 26, and Mansdorf consented on July 18, *id.* 30. On May 15, the district court granted a default judgment against defendant Damato. *Id.* 27.

6.  J.A. at 70–72.

7.  *Id.* at 6.

8.  *Id.* at 76.

9.  *Id.* at 78.

10.  *Id.* at 75, 78.

11.  *Id.* at 7, 73.

*tional City Lines, Inc.*, 337 U.S. 78, 85, 69 S.Ct. 955, 93 L.Ed. 1226 (1949) (Douglas, J., dissenting).

■ Section 1404(a) finds its origins in the doctrine of *forum non conveniens. See generally Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). However, because section 1404(a) contemplates transfer in addition to dismissal to remedy the plaintiff's choice of an inconvenient forum, it is evident "Congress . . . intended to do more than just codify the existing law on *forum non conveniens.*" *Norwood v. Kirkpatrick*, 349 U.S. 29, 32, 75 S.Ct. 544, 546, 99 L.Ed. 789 (1955). Thus, section 1404(a) is a revision as well as a codification, and a transfer is available "upon a lesser showing of inconvenience" than that required for a *forum non conveniens* dismissal. *Id.* "This is not to say that the relevant factors have changed or that the plaintiff's choice of forum is not to be considered, but only that the discretion to be exercised is broader." *Id.*

This court has said that "it is perhaps impossible to develop any fixed general rules on when cases should be transferred . . . ." *Starnes v. McGuire*, 168 U.S. App.D.C. 4, 15, 512 F.2d 918, 929 (1974) (en banc). Thus, the proper technique to be employed is a factually analytical, case-by-case determination of convenience and fairness. *Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *Starnes v. McGuire*, 168 U.S.App.D.C. 11, 14, 512 F.2d at 925, 928.

■ The appellant concedes, as indeed he must,[12] that venue is proper in the District of Columbia. Brief for Appellant at 2, 32–33. If venue is proper, "[t]ransfer elsewhere under Section 1404(a) must . . . be justified by particular circumstances that render the transferor forum inappropriate by reference to the considerations specified in that statute." *Starnes v. McGuire*, 168 U.S.App.D.C. at 11, 512 F.2d at 925. Appellant must bear the burden of persuasion on the transfer issue. *Time, Inc. v. Manning*, 366 F.2d 690, 698, 1 A.L.R. Fed. 1, 13 (5th Cir. 1966). Thus, the ruling of the district court denying the motion to transfer in this case is effectively a ruling that Zimmerman had failed to shoulder his burden. We believe that the district court did not abuse its broad discretion in so ruling.

There can be no doubt that a plaintiff's choice of forum is entitled to at least some

12. Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1976), provides, in pertinent part:

> Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business . . . .

Thus, a civil suit for an injunction may be brought, *inter alia*, where "a criminal proceeding, based upon the same illegal conduct, could be brought," *Investors Funding Corp. v. Jones*, 161 U.S.App.D.C. 420, 422, 495 F.2d 1000, 1002 (1974) (per curiam)—that is, where "any act or transaction . . . occurred." 15 U.S.C. § 78aa (1976).

The Securities and Exchange Commission (SEC or Commission) alleged three independent theories to support its contention of correct venue. The first theory was that Zimmerman caused or facilitated documents to be filed in Washington. The second theory was that Zimmerman made a telephone call from Washington, D.C., to Dallas. The third theory was that, where a complaint alleges a common scheme, venue good as to one defendant is good as to all. R.E. 4, at 3–6. *See generally* 4 A. Bromberg, Securities Law: Fraud § 11.3, at 247–48 (1977).

The Commission sought to have appellant enjoined, *inter alia*, in connection with certain filings required by the federal securities laws. The filings are a Form 8–K filed on or about February 11, 1974, a Schedule 13D filed on or about April 10, 1974, and a Form 10–K filed on or about May 24, 1974. J.A. at 16–18. Zimmerman was enjoined in connection with these documents. *SEC v. Zimmerman*, 407 F.Supp. 623, 629–31 (D.D.C.1976).

The act of filing has a locus in the District of Columbia, *Investors Funding Corp. v. Jones*, 161 U.S.App.D.C. at 423, 495 F.2d at 1003, as does the failure to file, *Travis v. United States*, 364 U.S. 631, 636, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961). Thus, "venue for civil enforcement actions of the Commission, involving reports required to be filed in the District of Columbia, is here." *Investors Funding Corp. v. Jones*, 161 U.S.App.D.C. at 423, 495 F.2d at 1002.

weight. *Menard v. Mitchell*, 139 U.S.App. D.C. 113, 115, 430 F.2d 486, 488 n. 3 (D.C. Cir.1970); *Zorn v. Anderson*, 263 F.Supp. 745, 749 (S.D.N.Y.1966). *See also Gulf Oil Corp. v. Gilbert*, 330 U.S. at 508, 67 S.Ct. 839. Appellant contends, however, that this factor should be accorded little, if any, significance in this case because the Commission has a field office located near Dallas, Brief for Appellant at 33–34, because venue is "bare-bones", *id.* at 32–33, and because, in appellant's view, " 'none of the operative facts' " occurred in the District of Columbia, *id.* at 32.

Taking these contentions in reverse order, we note that appellant maintains that "nothing—*nothing at all*—was done in the District of Columbia (with the exception of a single trivial telephone call)." *Id.* At the very least, we view the matter differently. In addition to the phone call Zimmerman admits having made from Washington, we noted earlier that a Form 8–K was filed with the Commission in Washington, D.C., on or about February 11, 1974; that a Schedule 13D was filed similarly on or about April 10, 1974; and finally, that a Form 10–K was filed on or about May 24, 1974.[13] It is plain, contrary to appellant's assertions, that some of the operative facts *did* occur within the District of Columbia.

Appellant argues that the filings are relatively insignificant events that create but "bare-bones venue". *Id.* at 32–33. Once again, we are unable to agree. Both the Supreme Court and this court have held that the place where a document is to be filed may be regarded as the place where any asserted non-filing or misfiling occurred. *Travis v. United States*, 364 U.S. 631, 636, 81 S.Ct. 358, 362, 5 L.Ed.2d 340 (1961) ("When a place is explicitly designated where a paper must be filed, a prosecution for failure to file lies only at that place."); *United States v. Lombardo*, 241 U.S. 73, 36 S.Ct. 508, 60 L.Ed. 897 (1916);

*Investors Funding Corp. v. Jones*, 161 U.S. App.D.C. 420, 422–423, 495 F.2d 1000, 1002–03 (1974) (per curiam). Appellant's notion that the Commission's choice of forum in this case is entitled to little weight is not persuasive.

Although it has been held that Section 27 of the Securities Exchange Act of 1934 does not establish a "privilege" for the plaintiff such that a section 1404(a) transfer will be possible only when the "privilege" has been abused, *Freiman v. Texas Gulf Sulfur Co.*, 38 F.R.D. 336 (N.D.Ill.1965), it has been suggested that the presence of such a special venue statute is a factor to be considered. *Zorn v. Anderson*, 263 F.Supp. at 749; *Freiman v. Texas Gulf Sulfur Co.*, 38 F.R.D. at 339. We need not go as far as *Freiman* or *Zorn* in order to refute Zimmerman's contention that the plaintiff's choice of forum is entitled to no value in this circumstance.

We turn now to appellant's last reason why the plaintiff's choice of forum should be minimized—that the Commission had a field office near Dallas. This fact seems to us to be more relevant to the question of whether the choice of the District of Columbia is, in fact, convenient for the plaintiff, than the question of how much weight should be given to the plaintiff's choice of forum.

Insofar as the convenience of the Commission is concerned, it must be remembered that, when this case was commenced, there were six named defendants.[14] As of that time, there can be no doubt that the convenience of the Commission would have been a legitimate factor militating very strongly for retention of the trial in the District of Columbia. Moreover, even at the time of the last motion to transfer, the Commission alleged that transfer would be inconvenient for it (as opposed merely to being inconvenient for its attorneys), as the

---

13. The fact that these documents were filed is not disputed by appellant, Brief for Appellant at 11–12, nor is the fact that the documents provide a proper venue in the District of Columbia. *Id.* at 32–33.

14. The complaint recites that defendant Savoy Industries, Inc. was a corporation organized in Delaware with its general offices in Long Island City, New York, and that defendants Damato and Mansdorf resided in California. J.A. at 12–13.

other activities of the attorneys involved would be hindered. J.A. at 32–33. The mere existence of a Commission field office near Dallas has not been demonstrated to be a compelling factor for reversal.

■ There can be no doubt that the granting of Zimmerman's motion would have led to a delay. The trial was scheduled to begin in Washington on October 22, 1975, one week after the date of Zimmerman's final motion to transfer. Although there is a disagreement as to when the case could have been reached by the Dallas court,[15] appellant does not dispute the fact of a delay.[16] Despite the fact that "congestion alone is not sufficient reason for transfer," *Starnes v. McGuire*, 168 U.S.App.D.C. at 18, 512 F.2d at 932, it is true that "relative docket congestion and potential speed of resolution is an appropriate factor to be considered." *Id.; see Gulf Oil Corp. v. Gilbert*, 330 U.S. at 508, 67 S.Ct. 839. It is undisputed that a more prompt trial could be had in the District of Columbia.[17]

The propriety of considering delay seems especially evident in view of the district court's assertion that "we have spent a certain amount of time on this case. We are familiar with it. It is ready for trial." J.A. at 71. Thus, not only would delay from a crowded docket be present, but also the delay associated with the Dallas district court's having to prepare itself for this complicated case. Although the court in Washington cannot be said to be more familiar with the applicable federal securities statutes than the court in Dallas, it is nevertheless apparent that the court here had a familiarity with the allegations, characters, lawyers, and previous history of litigation of this particular case. *See Wyndham Associates v. Bintliff*, 398 F.2d at 619–20 (quoting *Cosmos Bank v. Bintliff*, 67 Civ. 1984 (S.D.N.Y. July 20, 1966)).

A transfer of this case to Dallas in all probability would have been more convenient for the appellant. It is undisputed that Zimmerman was a resident of Dallas. J.A. at 12. More importantly, Zimmerman maintains that a transfer was necessary so as to provide more convenient access to the prospective witnesses for him "who could not be present at a trial held in Washington, all of them being from Dallas." Brief for Appellant at 24.

Whereas it is true that appellant made a proffer of the testimony of prospective witnesses giving their names and a general summary of their testimony, *see* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3851, at 264–74 (1976), this proffer must be placed in perspective with the surrounding circumstances. Since it was made only one week before the trial was scheduled to commence, the

---

15. At the hearing of October 15, 1975, the district court requested counsel to submit information concerning the condition of the docket for the United States District Court in Dallas. *Id.* at 100. In its order denying transfer, dated October 16, 1975, the district court stated that it had made "independent inquiry of the Texas court." *Id.* at 73. When the trial opened, defense counsel went immediately into the nature of the inquiry, and the district court revealed that its law clerk spoke by telephone with the clerk in Dallas and that the information received by the district court indicated that the docket in Dallas was highly contested. *Id.* at 104–06.

On appeal, appellant challenges the district court's use of this procedure. Brief for Appellant at 36–37. He urges that some form of written communication was required. *Id.* As a practical matter, the fact that the trial was scheduled to commence in one week effectively precluded the use of a written inquiry. Surely, under the circumstances, it was desirable to ascertain as rapidly as possible whether the trial would be held on October 22 in Washington. We see no error in the district court's use of this procedure. *See* Fed.R.Evid. 201(b)(2); Wright & Graham, Federal Practice and Procedure: Evidence § 5106 (1977). *See also United States v. 1,078.27 Acres of Land, More or Less, Situated in Galveston County, Tex.*, 446 F.2d 1030, 1034 (5th Cir. 1971), *cert. denied sub nom. Galveston City Co. v. United States*, 405 U.S. 936, 92 S.Ct. 945, 30 L.Ed.2d 811 (1972).

16. R.E. 43, at 7.

17. We are not unmindful of Mr. Justice Black's admonition regarding a 28 U.S.C. § 1404(a) transfer motion that "to delay justice may be to deny justice." *Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 672, 73 S.Ct. 900, 905, 97 L.Ed. 1331 (1963) (Black, J., concurring in part and dissenting in part).

district court remarked that "it c[a]me [ ] a little late in the day." J.A. at 92. Defense counsel's explanation was that this late proffer followed an extended attempt by the defense to persuade these witnesses to come at their own expense.[18] This explanation does not suffice to offset the fact that the unavailability of these witnesses could have been ascertained and disclosed at an earlier time. Appellant was free to make the proffer at any time.

Finally, our review of the record convinces us that the district court gave a full and proper consideration to appellant's apparent dilemma. Not insignificantly, it suggested to Zimmerman's counsel that he state what each witness might say. *Id.* at 79. There followed a rather extended and spirited discussion of the testimony of these witnesses with regard to duplication, materiality, and other factors involved under 28 U.S.C. § 1404(a). J.A. at 79–100. The district court adjourned "to think about this and read the cases," and gave the parties an opportunity to submit additional authorities. *Id.* at 100. On this record, we can see only full and fair consideration with no abuse of discretion.

## C. *Appellant's due process contention*

■ Appellant urges that the failure to transfer this case violated his due process right to a fair trial in that he was denied access to the Dallas witnesses "who could appear for him," *id.* at 77. Brief for Appellant at 21–37. Although appellant purports only to be challenging the failure to transfer under 28 U.S.C. § 1404(a), a fair interpretation of appellant's attack indicates

that its scope may be broader than he suggests. An examination of appellant's argument makes clear that he is complaining of the very fact of a Washington trial in this case. Consequently, it appears to us that appellant is mounting a constitutional challenge not only to the failure of the district court to transfer this case, but also to the venue provision that brought Zimmerman's case to Washington, section 27 of the Securities Exchange Act of 1934. To the extent that appellant is attacking this venue provision, his challenge must be denied based on the excellent reasoning of Chief Judge Learned Hand in *Gratz v. Claughton,* 187 F.2d 46 (2d Cir.), *cert. denied,* 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951).[19]

Insofar as Zimmerman bases his constitutional challenge on the failure of the district court to exercise its discretion, we have already held that Zimmerman failed to shoulder his burden in showing the need for a transfer. Although we find the appellant's argument innovative, it must fail. It seems to us that, if the district court did not abuse its discretion by refusing to transfer this case, a fortiori it did not act in an unconstitutional manner.

We find substantial precedential support for our conclusion in the recently decided case of *United States v. Testa,* 548 F.2d 847 (9th Cir. 1977). *Testa* involved a constitutionally based appeal from the district court's decision not to transfer under rule 21(b)[20] of the Federal Rules of Criminal Procedure, which "liken[s] the standard in criminal cases to its civil counterpart [footnote omitted]." *Jones v. Gasch,* 131 U.S. App.D.C. 254, 259, 404 F.2d 1231, 1236–37

---

**18.** Defense counsel stated, "We have attempted, I am told, for weeks to see if some of these people would come on their own and pay their own expenses because Mr. Zimmerman cannot afford to do so." J.A. at 78.

**19.** Chief Judge Learned Hand, for a unanimous panel of the Second Circuit, wrote:

The challenge to the validity of the venue provision—§ 27—depends upon the supposed unfairness of compelling the defendant to defend an action brought far from his residence, Florida, upon transactions which took place in New York. It is an answer that a man may be prosecuted even for a crime—to

say nothing of a civil wrong—in any district where he has brought to pass the proscribed event, however far that may be from his home.

*Gratz v. Claughton,* 187 F.2d 46, 50 (2d Cir.), *cert. denied,* 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951).

**20.** Fed.R.Crim.P. 21(b) provides: "For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one or more of the counts thereof to another district."

(1967), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968).[21]

In *Testa,* defendant-appellant Epstein argued to the Ninth Circuit, that his due process right to a fair trial had been abridged because his trial had been held in Hawaii. Epstein asserted that the only defendants who went to trial resided in the Central District of California, that the relevant overt acts in furtherance of the conspiracy were committed in or near Los Angeles and Las Vegas, that the costs of travel to Hawaii and the costs of remaining there precluded him from producing favorable witnesses from Los Angeles, and that the Government would suffer no inconvenience. 548 F.2d at 856. In overruling the defendant's argument, the court pointed out that a rule 21(b) motion was discretionary, and that the defendant had not met his burden. Moreover, the defendant had made no effort to subpoena witnesses, and had moved for transfer only eight days before trial. *Id.* at 856–57.

In the case at bar, we have already seen that section 1404(a) contemplates a discretionary ruling on a transfer motion[22] and that Zimmerman failed to meet his burden. It is, of course, undisputed that he did not tender the names of his prospective witnesses until one week before the trial was scheduled to begin, and that he made no

significant effort, through deposition or otherwise,[23] to ensure the contributions of these missing prospective witnesses to the evidence-gathering process.[24]

## II. THE SUBSTANTIVE FINDINGS OF THE DISTRICT COURT

### A. *Overview*

The district court made extensive Findings of Fact and Conclusions of Law concerning Zimmerman's alleged violations of the federal securities laws. *See SEC v. Zimmerman,* 407 F.Supp. 623 (D.D.C.1976). Because the published findings are so extensive, we shall relate the facts only as necessary for our own disposition.

Despite the fact that the record contains a great deal of information concerning Zimmerman's various involvements and his attempts to gain control over States General Life Insurance Company (States), it appears to us that Zimmerman's presence in court springs unmistakably from the fact that there existed five allegedly misleading or incomplete documents. The documents are as follows:

1) A Schedule 13D, filed April 10, 1974, by a group consisting of Interstate, Nation-

---

21. The "civil counterpart" is, of course, 28 U.S.C. § 1404(a) (1970). *Jones v. Gasch,* 131 U.S.App.D.C. 254, 260, 404 F.2d 1231, 1237 & n.25 (1967), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968).

22. In this regard, Judge Frank once remarked: "At best, the judge must guess, and we should accept his guess unless it is too wild." *Ford Motor Co. v. Ryan,* 182 F.2d 329, 331–32 (2d Cir.), *cert. denied,* 340 U.S. 851, 71 S.Ct. 79, 95 L.Ed. 624 (1950). *See* 1 Moore's Federal Practice ¶ 0.145[5], at 1619–21 (2d ed. 1977).

23. The Commission suggested that Zimmerman could have used affidavits to protect himself while minimizing his expenses. J.A. at 31–32. At the opening of trial, however, it seems clear that the Commission resisted Zimmerman's attempt to proceed by affidavit. *See id.* at 106, 112–13. Although the district court denied Zimmerman's request, it did so preliminarily and without prejudice to renewal. *Id.* at 113.

24. In addition to the reasons contained in the text, *supra,* the court in *United States v. Testa,* 548 F.2d 847, 856–57 (9th Cir. 1977), also indicated that the defendant Epstein had given no specific examples of efforts to contact the witnesses, had given no specific examples of failure to obtain witnesses due to impecunity, had not identified the witnesses, and had not given a proffer as to the nature of their testimony. It also noted that the grant of a transfer would have severed the trials of the defendants.

In the instant case, Zimmerman's counsel did allege generally that the Dallas witnesses had been contacted, but he did not recite specifics, nor did he in fact claim that he had contacted the witnesses personally. *See* J.A. at 75–101. As discussed above, these witnesses were identified and their expected testimony was summarized only one week before the trial was scheduled to begin. *See* text *supra* at 4, 14. To the extent that specific examples of inability to obtain testimony were given, they were given at the same time. *See* J.A. at 76–101.

al Western Construction, Inc., and Lee Mansdorf in a representative capacity. J.A. at 780–91. In connection with this Sched- ule 13D, Zimmerman was found to have violated sections 10(b),[25] 13(d)(1),[26] and 13(d)(3)[27] of the Securities Exchange Act of

**25.** Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1976) provides, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**26.** Section 13(d)(1) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78m(d)(1) (1978), provides:

Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78*l* of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78*l* (g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bark, as defined in section 78c(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence and citizenship of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

This section was amended by the Domestic and Foreign Investment Improved Disclosure Act of 1977, Pub.L. No. 95–213, § 202, 91 Stat. 1498–99. *See also* § 13(g) & (h), 15 U.S.C.A. § 78m(g) & (h) (1978).

**27.** Section 13(d)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d)(3) (1976), provides:

When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

1934, rules 10b–5 [28] and 13d–1 [29] thereunder, and section 17(a) [30] of the Securities Act of 1933. Conclusion of Law (C.L.) 14, 407 F.Supp. at 630. Zimmerman was also found to be responsible as an "aider and abettor" with regard to this document. *Id.*

**28.** Rule 10b–5, 17 C.F.R. § 240.10b–5 (1977) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**29.** Rule 13d has undergone a series of amendments and proposed amendments. It was scheduled to be amended by SEC Release No. 34–13291, 42 Fed.Reg. 12350 (1977), and the effective date of the change was postponed to April 30, 1978, by SEC Release No. 34–13844, 42 Fed.Reg. 41406 (1977). Shortly before these rules were to be effective, the Commission again amended the rules, with the amendments to be effective on May 30, 1978. SEC Release No. 34–14692, 43 Fed.Reg. 18495 (1978). Rule 13d–1(a) requires, as did Rule 13d–1 during the relevant time period, the filing of a Schedule 13D, the requirements of which are given by Rule 13d–101, 17 C.F.R. § 240.13d–101.

The contents of Schedule 13D have been revised. Under the former provisions, Note B would require disclosure of certain information for each member of a group filing the statement and for each person controlling a member of the group. Item 2 required disclosure, *inter alia,* of the name and address of every person covered by Note B, as well as any criminal convictions of such persons within the last ten years. 17 C.F.R. § 240.13d–101 (1974).

With respect to the revised form, disclosure must still be made for each member of a group, as well as for each person controlling a member pursuant to Instruction C. Further, Item 2 now requires disclosure of criminal convictions within the previous five years, *see* 17 C.F.R. § 240.13d–101 (1977), and the Commission has now elected to require disclosure, *inter alia,* of whether a person covered by Instruction C has been the subject, within the five previous years, of a decision, final order, or judgment of injunction against future violations. *See* SEC Release No. 34–14692, 43 Fed.Reg. 18498

2) A form 8–K report, filed February 11, 1974, by Savoy. J.A. at 767–72. In connection with this Form 8–K, Zimmerman was found to have violated sections 10(b) and 13(a) [31] of the Securities Exchange Act of

(1978). Thus, under both the old rules and the amended rules, a group member would be required to make disclosure at minimum, of a criminal conviction as recent as five years.

Finally, we note that the Commission has now provided explicitly that a group may make a single joint filing or that each member may make an individual filing. *See* Rule 13d–1(e)(1)(ii) & (2), SEC Release No. 34–14692, 43 Fed.Reg. 18496 (1978).

**30.** Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1976), provides:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

**31.** Section 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(a) (1976), provides:

Every issuer of a security registered pursuant to section 78*l* of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security—

(1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78 *l* of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.

(2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.

Every issuer of a security registered on a national securities exchange shall also file a

1934, rules 10b–5 and 13a–11[32] thereunder, and section 17(a) of the Securities Act of 1933. C.L. 15, 407 F.Supp. at 630.

3) A Form 10–K report, filed on May 24, 1974, by Savoy. J.A. at 754–66. In connection with this Form 10–K, Zimmerman was found to have violated sections 10(b) and 13(a) of the Securities Exchange Act of 1934, rules 10b–5 and 13a–1[33] thereunder, and section 17(a) of the Securities Act of 1933. C.L. 15, 407 F.Supp. at 630.

4) A letter to stockholders sent by Savoy, dated April 5, 1974. J.A. at 792–97. In connection with this letter, Zimmerman was held to have violated section 10(b) of the Securities Exchange Act of 1934, rule 10b–5 thereunder, and section 17(a) of the Securities Act of 1933. C.L. 16, 407 F.Supp. at 630.

5) An American Stock Exchange listing application filed by Savoy, dated February 12, 1974. J.A. at 774–79. In connection with this document, Zimmerman was held to have violated section 10(b) of the Securities Exchange Act of 1934, rule 10b–5 thereunder, and section 17(a) of the Securities Act of 1933. C.L. 17, 407 F.Supp. at 630–31.

As we perceive the Commission's theory of this case, there are two basic branches of alleged liability. The first branch hinges on a finding that Zimmerman, or a group of which Zimmerman was a member, controlled Savoy. See C.L. 11, 407 F.Supp. at 630; Finding of Fact (F.F.) 36, 407 F.Supp. at 628. Under this "control" branch of liability, the Commission appears to maintain that Zimmerman was liable vicariously for the allegedly misleading Form 8–K, Form 10–K, American Stock Exchange listing application, and letter to stockholders, all of which were promulgated or filed by Savoy. Brief of the SEC, Appellee at 40–43, 49–54.[34]

The second basic branch of liability that the Commission seeks to impose upon Zimmerman stems from his alleged role as a member[35] of a group that held shares of Savoy. See C.L. 11, 407 F.Supp. at 630. Under this branch, the SEC maintains that Zimmerman is directly liable as a group member for the allegedly misleading Schedule 13D. Brief of the SEC, Appellee at 44–48. "The holding with respect to these violations was completely independent of the court's separate holding that Zimmerman controlled Savoy, since the filing was

duplicate original of such information, documents, and reports with the exchange.

**32.** Rule 13a–11, 17 C.F.R. § 240.13a–11 (1974), provided, in pertinent part:

(a) Except as provided in paragraph (b) of this section, every registrant subject to § 240.13a–1 shall file a current report on Form 8–K within 10 days after the close of any month during which any of the events specified in that form occurs, unless substantially the same information as that required by Form 8–K has been previously reported by the registrant.

In 1977, the Commission deleted "ten days after the close of any month during which any of the events specified in that form occurs," and in lieu thereof added, "the period specified in that form." SEC Release No. 34–13156, 42 Fed. Reg. 4424 (1977).

**33.** Rule 13a–1, 17 C.F.R. § 240.13a–1 (1977), provides:

Every issuer having securities registered pursuant to section 12 of the Act shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registra-

tion statement. Registrants on Form 8–B, § 249.308b of this chapter, shall file an annual report for each fiscal year beginning on or after the date as of which the succession occurred. Annual reports shall be filed within the period specified in the appropriate form. At the time of filing the annual report, the registrant other than a person registered under the Public Utility Company Act of 1935 or the Investment Company Act of 1940 shall pay to the Commission a fee of $250, no part of which shall be refunded.

**34.** This branch of liability appears to have been the Commission's theory at trial. R.E. 47, at 13–16; *id.* 63 ¶ 6, at 4–5, *id.* 64 ¶ 4, at 3–4. *See also id.* 1 ¶¶ 27–30, 32, 35–38, at 7–8, 10; *id.* 15, at 2–3.

**35.** The district court further found that Zimmerman controlled Interstate General, Inc. which was also a member of the group. Conclusion of Law (C.L.) 10, 407 F.Supp. at 630. The conclusion that he controlled a group member is, of course, distinct from the conclusion that he was a group member, and distinct from the finding that he controlled Savoy.

required not of Savoy but of the group which had acquired its shares." *Id.* at 45.[36] Thus, this case is predicated on the contents of five documents and is founded on two basic theories of potential responsibility. *See generally SEC v. Coffey*, 493 F.2d 1304, 1315–19 (6th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). Our analysis will be so directed.

B. *The Liability for the Schedule 13D*

■ In the view of the district court, with respect to the Schedule 13D, Zimmerman was required to disclose his background and his identity [37] both because he was a member of the group and because he was a person who controlled another member of the group—namely, Interstate.[38] C.L. 3–4, 10–14, 407 F.Supp. at 429–30. We note that, with regard to this direct, "group member" branch of liability, the fact of being a group member has at least a dual legal significance: it serves as a basis for imposing liability, and, additionally, it is a fact that should have been disclosed.[39]

■ In order to review this determination, we must first consult briefly the cases and authorities to determine what constitutes a "group" within the meaning of section 13(d)(3).[40] The first major case to shed any significant light upon our inquiry is *Bath Industries, Inc. v. Blot*, 427 F.2d 97 (7th Cir. 1970). In passing upon the ques-

tion of when the filing requirements come into play, the court ruled that a "group" must file "when, but only when, any group of stockholders owning more than 10% [now 5%] of the outstanding shares of the corporation agree to act in concert *to acquire additional shares*." *Id.* at 109. The court held that once a "common objective" is demonstrated, and a subsequent purchase is made by a member of the group, a rebuttable presumption arises that such purchase was made pursuant to an agreement of the group to purchase additional shares. *Id.* at 110. The court also stated that a "critical fact which must be found . . . is that the defendants . . . combin[ed] in support of the common objective . . . ." *Id.* at 111. There are at least two principles from *Bath Industries* that are relevant here: first, that group activity under section 13(d)(3) must involve a combination in support of a common objective, and, second, that the existence of a section 13(d)(3) group may be demonstrated circumstantially.

The holding of *Bath Industries* to the effect that an agreement to acquire additional shares precedes the necessity to make a Schedule 13D filing has not gone without contradiction. *See GAF Corp. v. Milstein*, 453 F.2d 709, 718 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). However, the courts have amplified the *Bath Industries* principle that a combi-

---

**36.** Again, this second branch of liability appears to have been the Commission's theory at trial. R.E. 47, at 13–16; *id.* 63 ¶ 5, at 3; *id.* 64 ¶ 8, at 6. *See also id.* 1 ¶¶ 23–24, 32–34, at 6–7, 10; *id.* 15, at 1–3.

**37.** *See* note 29 *supra.* In October 1971, Zimmerman was indicted before the United States District Court for the Southern District of Florida. In January 1972, Zimmerman entered a plea of guilty to three counts of securities fraud and one count of mail fraud. *See* Finding of Fact (F.F.) 3, 407 F.Supp. at 624–25; J.A. at 714–16; *id.* at 442–44. In addition, Zimmerman was enjoined permanently by the United States District Court for the Southern District of New York from future violations of section 17 of the Securities Act, section 10(b) of the Securities Exchange Act of 1934, and rule 10b–5 thereunder in connection with the publication of press releases and other statements concerning Prebuilt Homes, Inc. and Interconti-

nental Industries, Inc. *Id.* at 724–25. Zimmerman consented to the entry of that injunction. *Id.* at 724–25, 728–29; *see* F.F. 3, 407 F.Supp. at 624–25.

**38.** *See* note 35 *supra.*

**39.** Because of our resolution of this issue, we need not reach the theory that Zimmerman is liable because he "controlled" Interstate.

**40.** It has been remarked, and not without some justification, that "[w]hile the question of when a 'group' must file a Schedule 13D statement has been thoroughly reviewed by several courts . . . the question of just what types of arrangements between investors will create a 'group' for purposes of the Schedule 13D filing requirements has received little exposure to date." E. Aranow & H. Einhorn, Tender Offers For Corporate Control 91 (1973).

nation is the key to a finding of a section 13(d)(3) group. *Corenco Corp. v. Schiavone & Sons*, 488 F.2d 207, 217 (2d Cir. 1973); *Texasgulf, Inc. v. Canada Development Corp.*, 366 F.Supp. 374, 403 (S.D.Tex.1973); *see GAF Corp. v. Milstein*, 453 F.2d at 718. Moreover, the agreement need not be written. *Twin Fair, Inc. v. Reger*, 394 F.Supp. 156, 160 (W.D.N.Y.1975); *see Jewelcor, Inc. v. Pearlman*, 397 F.Supp. 221, 250 (S.D.N.Y. 1975). Any arrangements may be formal or informal. *Graphic Sciences, Inc. v. International Mogul Mines Ltd.*, 397 F.Supp. 112, 124 n.35. (D.D.C.1974).

It can readily be seen that the foregoing comports generally with the legislative history of section 13(d)(3). Concerning this section, both the House and Senate Reports state:

> This provision would prevent a group of persons *who seek to pool* their voting or other interests in the securities of an issuer *from evading the provisions of the statute because no one individual owns more than 10[5] percent of the securities. The group would be deemed to have become the beneficial owner, directly or indirectly, of more than 10[5] percent of a class of securities at the time *they agreed to act in concert.* . . . This provision is designed to obtain full disclosure of the identity of any person or group obtaining the benefits of ownership *by reason of any contract, understanding, relationship, agreement or other arrangement.*

S.Rep. No. 550, 90th Cong., 1st Sess. 8 (1967); H.R.Rep. No. 1711, 90th Cong. 2d Sess. 8–9 (1968), *reprinted in* [1968] U.S. Code Cong. & Admin.News. 2811, 2818 (emphasis added).

The fact that the quoted passage speaks of "those who seek to pool . . . their interests," and of those who "agree to act in concert," implies strongly that some type of combination toward concerted action is necessary. However, it is equally clear that whatever meeting of the minds, understanding, or arrangement that may exist need not be written. It is possible, indeed commonplace, for two or more to take concerted action informally.

This interpretation is fortified by the language in the last sentence of the above-quoted passage. The use of "any," "understanding," "relationship," and "other arrangement" emphasizes the notion that concerted action need not be formalized or express. The scope of section 13(d)(3) was clearly intended to extend beyond agreements and contracts in the classical contractual "offer" and "acceptance" sense. Surely, the broad language demonstrates an unmistakable congressional intent to bring pooling arrangements within the purview of section 13(d)(3), irrespective of whether they be formal or informal, written or unwritten.

Further, this result seems dictated by common sense. A contrary interpretation would exalt form over substance, as group disclosure under section 13(d)(3) would then hinge on the degree of formality of the arrangement. The purpose of the statute would unquestionably be frustrated, *Water & Wall Associates, Inc. v. American Consumer Industries*, [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,943, at 93,756 (D.N.J.1973), and a tremendous and unwarranted burden would be placed on the plaintiff. *See Bath Industries, Inc. v. Blot*, 427 F.2d at 110.

In summary, our task is to sift through the record to determine whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal agreement or understanding. The proper standard in reviewing the district court's determination that Zimmerman was a member of a group is whether the determination is "clearly erroneous." *See Corenco Corp. v. Schiavone & Sons*, 488 F.2d at 218; Fed.R.Civ.P. 52(a).

Although appellant in his brief does not frame his objections to the Findings of Fact and Conclusions of Law explicitly as a challenge to the fact of his membership in the "group," he does state that he "had nothing to do with the Savoy transaction except to help out if asked to do so . . . ." Brief for Appellant at 56. We view this assertion as a rather broadly stated challenge to the

district court's determination that Zimmerman was a member of the group, because, had Zimmerman lacked any involvement with Savoy, he would not have engaged in concerted activity sufficient to establish group membership.

The first fact to be noted is that Zimmerman was not a stranger to Savoy at the time of the filing of the Schedule 13D on April 10, 1974. In fact, the district court found that Zimmerman had known Danenberg, the president of Savoy, for a number of years, F.F. 18, 407 F.Supp. at 627, and Zimmerman acknowledged having met Danenberg in 1963 or 1964, J.A. at 628–29.[41] He admitted having been a stockholder in Savoy since approximately 1965 or 1966, id. at 630, and having bought Savoy stock since 1964, id. at 578. He further testified that he owned, at the time of trial, "somewhere around 26,000 shares," id. at 603, and that he owned "somewhere around 26– to 30,-000" shares in 1973, id. at 653. Weinkrantz testified that Zimmerman and Danenberg requested him to purchase Savoy shares for Zimmerman on January 16, 1974,[42] that he made the purchases in his name and asked that the shares be put in street names, and that he made three additional purchases pursuant to requests by Zimmerman in late January 1974. Id. at 245–46. Zimmerman admitted that Weinkrantz made some purchases for him, but was in doubt as to the number of requests. Id. at 603–04; see F.F. 27, 407 F.Supp. at 628. In any event, it can readily be seen that Zimmerman had a rather substantial interest in Savoy at the time of the negotiations and the deal resulting in the transfer of the 172,000 shares of Savoy stock.[43]

That Zimmerman had a common purpose with the members of the group also appears to be well supported by the evidence. After the issuance of the 172,000 shares, three out of four of the Savoy directors resigned and were replaced. Weinkrantz became the new president of Savoy. The district court found, and we agree, that Zimmerman was a participant in the concerted activity that led to the change in leadership, F.F. 30, 407 F.Supp. at 628.

Weinkrantz testified that Zimmerman was involved in the initial discussions concerning who would become president of Savoy, and, in fact, that it was Zimmerman who initiated the discussions. J.A. at 221–22. Weinkrantz also agreed that Zimmerman was involved "in decisions relative to who would become members of the board of directors of Savoy." Id. at 251. According to Weinkrantz, Zimmerman suggested Fortescue as a potential director of Savoy, and Weinkrantz' suggestion of Elfenbein for the board was rejected because "[h]e wasn't known to Mr. Zimmerman." Id. at 251–52.

The Schedule 13D that was filed revealed that it was the "intention of such group that Savoy will . . . consider expanding the business of Savoy into aspects of the insurance business . . .." Id. at 788. This "intention" was not, to say the very least, unfamiliar to Zimmerman. Zimmerman had, previous to the relevant Savoy transactions, made a two-phased attempt to control States, an insurance company. F.F. 6–17, 407 F.Supp. at 625–27. Weinkrantz testified that Zimmerman was a regular participant in discussions concerning the possibility of directing Savoy toward the life insurance business, J.A. at 186–87, which was thought to be "a great direction to go in." Id. at 187; accord, id. at 262. Fortescue, a director of Savoy after April 18, 1974, stated that Zimmerman attended the second meeting of the board of directors at which Danenberg discussed the general condition of Savoy, and at which there was a "general discussion about involving the company in a potential insurance company purchase or acquisition of an insurance company." Id. at 524–26. Zimmerman admitted that he suggested to Weinkrantz the possibility of a Savoy deal

---

41. Cf. J.A. at 649 ("We talked for fourteen years."). Danenberg died in 1974.

42. The agreement to issue the 172,000 shares was dated January 31, 1974. Id. at 780.

43. Zimmerman agreed that his investment in Savoy at that time was worth in excess of $100,000. Id. at 653.

for Interstate and that the discussions concerning the Savoy transaction had commenced with Zimmerman's proposing to Danenberg that "Savoy might want to diversify into life insurance." *Id.* at 503–04.

Finally, but of great importance, are the facts relating to Zimmerman's involvement with Interstate, which itself was reported as a member of the group on the Schedule 13D. J.A. at 780–91. Although Zimmerman was not an officer or director of Interstate, there can be no doubt that he was, in practice, able to exert substantial influence over it. *See* F.F. 8–16, 407 F.Supp. 625–27.

On account of the transaction that transferred the 11,046 shares of States stock into Interstate, Zimmerman became the pledgee of 400,000 of the 500,000 shares outstanding of Interstate. F.F. 13, 407 F.Supp. at 626; J.A. at 146–56, 469–70. The underlying debt from Weinkrantz to Zimmerman was a note for $88,368, F.F. 12, 407 F.Supp. at 626, and was given in exchange for the transfer of the 11,046 shares. Weinkrantz's estimated net worth was between $40,000 and $50,000. F.F. 14, 407 F.Supp. at 626; J.A. at 483; *see id.* at 159. Despite the fact that the original note was torn up after the SEC investigative subpoena had been received, F.F. 14, 407 F.Supp. at 626; J.A. at 151–52, 156, it can readily be observed that Zimmerman had a substantial financial stake in Interstate. Interstate in essence "adopted" the Zimmerman goal of gaining control of States, *see* F.F. 9, 407 F.Supp. at 625, and the information given on the Schedule 13D manifests Interstate's continued interest in the life insurance business. On the basis of the foregoing evidence, we must conclude that Zimmerman had effectively joined forces with the other group members and should have been included on the Schedule 13D.[44]

Sections 13(d)(1) and 13(d)(3) and the rules promulgated thereunder undoubtedly create the duty to file truthfully and completely. To the extent that the violation of sections 13(d)(1) and 13(d)(3) inheres in the Schedule 13D that was filed, it was this duty that was breached. Because section 13(d) was designed, in part, to allow investors an opportunity to know of potential changes in corporate control and to evaluate the situation, and because disclosure that is not accurate subverts this purpose, it is plain that section 13(d) requires the making of a completely truthful statement. *GAF Corp. v. Milstein*, 453 F.2d at 720. "The reporting provisions of the Exchange Act are clear and unequivocal, and they are satisfied only by the filing of complete, accurate, and timely reports." *SEC v. IMC International, Inc.*, 384 F.Supp. 889, 893 (N.D.Tex.), *aff'd mem.*, 505 F.2d 733 (5th Cir. 1974), *cert. denied sub nom. Evans v. SEC*, 420 U.S. 930, 95 S.Ct. 1131, 43 L.Ed.2d 402 (1975). *See also SEC v. Great American Industries, Inc.*, 407 F.2d 453, 456–58 (2d Cir. 1968) (en banc), *cert. denied*, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969).

Furthermore, we are unable to view Zimmerman's violations of the Williams Act disclosure requirements as mere technical or inconsequential violations. *Cf. Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 59, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975) (injunction denied to private litigant where "none of the evils to which the Williams Act was directed has occurred or is threatened . . . ."). In the case at bar, the fact of Zimmerman's participation, in view of his past troubles with the securities laws, is just the type of datum that is contemplated by the requirements of Schedule 13D, 17 C.F.R. 240.13d–101. *See generally* 113 Cong.Rec. 854–56, 24664–65 (1967) (remarks of Senator Williams). The group

---

**44.** Appellant contends that Conclusion of Law 13, 407 F.Supp. at 630, cannot stand because it contains a determination that Zimmerman violated sections 13(d)(1) and 13(d)(3) and rule 13d–1, which is distinct from Conclusion of Law 14, and which was not included in the Commission's complaint. Brief for Appellant at 60–61. The Commission agrees that it constitutes a finding of a second violation, but argues that such a finding was permissible. Brief of the SEC, Appellee at 48. We construe this finding not to be a determination of a second violation because of the district court's reference to section 13(d)(3). We interpret Conclusion 13 to be essentially the mirror image of Conclusion 14.

that included Zimmerman, by replacing the president of the corporation and three of four directors, was obviously making a bid for control and management of Savoy. In our view, the investors and prospective investors were entitled to know of Zimmerman's identity as a member of the group, and the information attendant thereto.

Interestingly enough, appellant does not now challenge the district court's reliance on *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), in the determination of materiality, in view of the Supreme Court's opinion in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), decided after the opinion of the district court in the instant case. *TSC Industries*, in passing upon materiality in the context of proxy statements, gave the following explanation:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important . . . .. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2132. This definition has subsequently been taken well outside the Rule 14a–9 context. *See, e. g., Harkavy v. Apparel Industries, Inc.*, 571 F.2d 737, 740–41 & n.5 (2d Cir. 1978); *SEC v. Koracorp Industries, Inc.*, 575 F.2d 692 at 701 (9th Cir. 1978); *Goldberg v. Meridor*, 567 F.2d 209, 218–19 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).

■ We note that the determination of materiality is a mixed legal and factual question, and that, because it requires "delicate assessments" of the significance of inferences to a "reasonable" person, it is deemed a question generally best left to the trier of fact. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. at 450, 96 S.Ct. at 2133. However, in the last analysis, it remains an objective question, *id.* at 445, 96 S.Ct. at 2130, and it may be resolved as a matter of law when reasonable persons could not differ as to the importance of the fact under scrutiny, *id.* at 450, 96 S.Ct. at 2133. Therefore, although mindful of the Supreme Court's general admonition against deciding the issue of materiality as a matter of law, we nevertheless believe that this issue may be disposed of at this time.. *See Galfand v. Chestnutt Corp.*, 545 F.2d 807, 813–14 (2d Cir. 1976), *cert. denied*, 943 U.S. 435, 98 S.Ct. 1524, 55 L.Ed.2d 540 (1978).

■ Proof of actual reliance is, of course, not necessary to support a finding of materiality. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. at 447 n.9, 96 S.Ct. 2126 (citing *Affiliated Ute Citizens v. United States*, 406 U.S. at 153–54, 92 S.Ct. 1456). Obviously, the purpose of the reporting requirement is generally to ensure disclosure to investors. More particularly, the purpose of section 13(d) is to alert investors to *potential* changes in control, and to give them an opportunity to evaluate the effect of the potential change. *GAF Corp. v. Milstein*, 453 F.2d at 720.

The fact of Zimmerman's participation in and of itself may well not be so obviously important that reasonable minds would not differ as to its materiality. However, when coupled with disclosure of his criminal conviction, the overall effect is much greater. Senator Williams, the co-sponsor of the Act that added section 13(d), clearly manifested the idea that disclosure of background is crucial to informed decisionmaking by the investor. 113 Cong.Rec. 854–56, 24664–65 (1967). The Commission's regulations specifically required disclosure of all convictions within the preceding ten years. 17 C.F.R. § 240.13d–101 (1974). Under these circumstances, we conclude that, had proper disclosure been made at the outset, there is a substantial likelihood that a reasonable investor would view the "total mix" of information quite differently. We therefore

see no purpose in remanding this issue to the district court.[45]

■ Appellant argues that the landmark decision of the Supreme Court in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), decided after the decision of the district court, vitiates the district court's conclusions because there was no finding of scienter. The holding in *Ernst & Ernst v. Hochfelder* to the effect that a private plaintiff must prove scienter to recover monetary damages under section 10(b) and rule 10b–5 rested, in large part, upon an analysis of the language of the section, the legislative history, the legislative intent, and section 10(b) vis-à-vis other provisions in the statutory scheme. A similar analysis of section 13(d)(1) leads us to conclude that the SEC need not prove scienter to establish a violation.

The language of section 13(d)(1) indicates clearly that it is a reporting, and not an antifraud, provision. In its analysis of section 10(b), the Supreme Court seized upon that section's use of the words "manipulative," "deceptive," "device," and "contrivance". 425 U.S. at 197, 96 S.Ct. at 1383. The Court reasoned that use of these terms manifested an "intent to proscribe a type of conduct quite different from negligence [footnote omitted]." *Id.* at 199, 96 S.Ct. at 1384. None of these terms is present in section 13(d)(1). Indeed, the plain language of section 13(d)(1) gives no hint that intentional conduct need be found, but rather, appears to place a simple and affirmative duty of reporting on certain persons.

The legislative history confirms that Congress was concerned with providing disclosure to investors, and not merely with protecting them from fraudulent conduct. Both the Senate Report and the House Report state that the general purpose of the bill was to amend "the Securities Exchange Act of 1934 by requiring the disclosure of pertinent information and [to] afford other protections to stockholders (1) when a per-

son or group of persons seeks to acquire a substantial block of equity securities of a corporation . . .." S.Rep. No. 550, 90th Cong., 1st Sess. 1 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess. 2 (1968), *reprinted in* [1968] U.S.Code Cong. & Admin.News, p. 2811. More specifically, each Report specifies that "[t]he purpose of section 13(d) is to require disclosure of information by persons who have acquired a substantial interest, or increased their interest in the equity securities of a company by a substantial amount, within a relatively short period of time." S.Rep. No. 550, *supra* at 7; H.R.Rep. No. 1711, *supra* at 8, *reprinted in* [1968] U.S. Code Cong. & Admin.News, pp. 2811, 2818. Thus, we note that the key provisions of the Senate and House Reports reflect a congressional intent to promote full disclosure by persons who have reached a certain level in terms of their acquisitions. Neither of these crucial passages explicitly distinguishes between conduct involving scienter and that not involving scienter, nor does either passage employ terms suggestive of fraud.

■ Therefore, the plain language and legislative history support the Second Circuit's view that "the purpose of section 13(d) is to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control . . .." *GAF Corp. v. Milstein,* 453 F.2d at 717. Where there exists a paramount congressional intent to protect the public, the defendant's state of mind is not solely determinative of whether an injunction is available to the SEC. *SEC v. World Radio Mission, Inc.,* 544 F.2d 535, 540–41 (1st Cir. 1976); *SEC v. Texas Gulf Sulfur Co.,* 401 F.2d 833, 868 (2d Cir. 1968) (en banc) (Friendly, J., concurring), *cert. denied sub nom. Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). *See also SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194–95, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

---

**45.** We note that our decision in this respect in no way conflicts with that of the district court. The district court also made an express finding of materiality, but its finding was predicated on a slightly lower standard. There can be little doubt that the district court would have found the element of materiality present even under the higher standard we employ here today.

Having established a violation,[46] we must determine whether the district court erred in entering an injunction against Zimmerman for his violation of section 13(d)(1) and 13(d)(3). We conclude that there is no error. Where, as here, the SEC is not attempting to halt an ongoing violation, "the ultimate test is whether the defendant's past conduct indicates . . . that there is *a reasonable likelihood* of further violation[s] in the future." *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 99–100 (2d Cir. 1978) (quoting 3 L. Loss, Securities Regulation 1976 (1961)); *accord, SEC v. Koracorp Industries, Inc.,* 575 F.2d at 699, 701; *SEC v. Universal Major Industries Corp.,* 546 F.2d 1044, 1048 (2d Cir. 1976), *cert. denied sub nom. Homans v. SEC,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

Zimmerman's past conduct is highly suggestive of his propensity to commit securities law violations and the likelihood that he will commit such violations in the future. *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972). His violation was not an isolated incident; he has not demonstrated that he understands his conduct to have been wrongful; and he does not give sufficient assurances against future violations. Furthermore, the nature of the appellant's business activities may present him with further temptations to violate the law. *SEC v. Universal Major Industries Corp.,* 546 F.2d at 1048; *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir. 1975). Under these circumstances, we believe that there is a sufficient probability of a future violation to uphold the district court on this issue. The absence of an express finding on the probability of future violations by the district court does not impair our ability to sustain the district court's injunction where the necessary fac-

tors are so obviously present. *Id.* at 807–08; *SEC v. Culpepper,* 270 F.2d 241, 250 (2d Cir. 1959).

Finally, appellant urges that it was error for the district court not to employ the "clear and convincing" standard of proof announced by this court in *Collins Securities Corp. v. SEC,* 562 F.2d 820 (D.C. Cir. 1977), for use in an administrative proceeding to revoke the broker-dealer and investment advisor registrations of the appellant. Reply Brief for Appellant at 11–14. *Collins* rested, in large part, upon two bases: that the appellant was accused of fraud, and that an affirmance meant a literal deprivation of livelihood. 562 F.2d at 824. Although it has come to be recognized that an injunction against future violations may be, in and of itself, a substantial burden on the party enjoined, *compare SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. at 193, 84 S.Ct. 275 *with SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d at 99, *and SEC v. Geon Industries, Inc.,* 531 F.2d 39, 54–55 (2d Cir. 1976), the imposition of an injunction to protect against future violations of reporting provisions is qualitatively different from that which was involved in *Collins.* The nature of the distinction was recently articulated by Judge Friendly:

> These actions [disciplinary actions] share with damage suits the quality of visiting serious consequences on past conduct, even though they also have a remedial effect. They thus differ from injunctive proceedings, the objective which is solely to prevent threatened future harm, although unlawful conduct is necessary—if not always sufficient—to demonstrate the reality of this threat. . . . Cf. Jaffe, Judicial Control of Administrative Action 267–68 (1965) ("Revocation, in-

---

**46.** The district court concluded that Zimmerman aided and abetted violations of sections 10(b), 13(d)(1) and 13(d)(3) of the Securities Exchange Act, rules 10b–5 and 13d–1 thereunder, and section 17(a) of the Securities Act of 1933. C.L. 14, 407 F.Supp. at 630. On appeal, the Commission contends that this conclusion rests on the premise that Zimmerman aided and abetted by virtue of his membership in the

group. Brief of the SEC, Appellee at 47. Because we conclude that his membership in the group caused him to be liable, we need not reach this aspect of the case. *See generally* Ruder, *Multiple Defendants In Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution,* 120 U.Pa.L.Rev. 597 (1972).

deed, seems often to be used as a sanction not so much to control the respondent as to warn others, and thus it has a significant 'penal' component, even though the courts may choose to mask its character by calling it a 'civil' remedy.") (footnote omitted).

*Arthur Lipper Corp. v. SEC,* 547 F.2d 171, 180–81 n.6 (2d Cir. 1976), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978).

The principal purpose of this type of injunction is, of course, to deter future violations, and not to punish the violator. *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Furthermore, an injunction against violation of the reporting provisions does not ipso facto involve a deprivation of livelihood, and, as a practical matter, would not be nearly as extensive an impairment to Zimmerman as a revocation would be to a broker-dealer. The standard of proof is a matter for the judiciary to decide, *see Collins Securities Corp. v. SEC,* 562 F.2d at 824 (quoting *Woodby v. Immigration & Naturalization Service,* 385 U.S. 276, 284, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)), and we believe that, under the circumstances, it is best to adhere to a preponderance of the evidence standard. *See GAF Corp. v. Milstein,* 453 F.2d at 718.

### C. *The "Control" Theory of Liability*

The district court found that the Forms 8–K and 10–K should have disclosed Zimmerman's identity and role in the Interstate-Mansdorf-Dunlap transaction. F.F. 25, 38, 407 F.Supp. at 627–28; C.L. 15, 407 F.Supp. at 630. The Commission argues that Zimmerman's past difficulties should have been disclosed. Brief of the SEC, Appellee at 8 n.6. In any event, Zimmerman's control is doubly significant because it is both a basis for imposing liability and a matter for disclosure.

With respect to the American Stock Exchange listing application and the letter to stockholders, the opinion of the district court recites merely that neither mentioned Zimmerman. F.F. 26, 28, 407 F.Supp. at 628; C.L. 16–17, 407 F.Supp. at 630–31.

The Commission in its brief states that Zimmerman's identity should have been disclosed. Brief of the SEC, Appellee at 52, and then suggests that "[t]he information concerning Zimmerman, his behind-the-scenes orchestration of the takeover, and his control of the new management," *id.* at 53–54, should have been disclosed.

We begin by noting that the district court did not recite its statutory basis for imposing liability on the appellant. Our review of the materials submitted at trial by the Commission does not shed a great deal of light on the matter. The Commission's brief is refreshingly candid, but slightly hesitant, on this point, directing us first to section 20(a) and then to section 20(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) & (b) (1976). Brief of the SEC, Appellee at 51 & n.51.

In relevant part, section 20 provides:

(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

(b) It shall be unlawful for any person directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person.

The history of the interpretation of section 20 in the courts has hardly been a history of consistency, especially in the context of SEC enforcement actions. The Sixth Circuit, by way of an alternative holding, has indicated its view that section 20(a) is not available to the SEC in an injunctive action because the SEC is not a "person" and because section 20(a) was intended to be employed solely in the context of private actions. *SEC v. Coffey,* 493 F.2d

at 1318. According to this view, the Commission must proceed in injunctive actions by way of section 20(b) which requires "knowing use of a controlled person by a controlling person before a controlling person comes within its ambit." *Id.* The district court in the case at bar made no specific finding that Zimmerman used Savoy knowingly. The Commission suggests that "the district court may have premised Zimmerman's violations on his having acted by means of [Savoy's officers and board], particularly Weinkrantz." Brief of the SEC, Appellee at 51 n.51. Without more, we cannot accept this as a basis for imposing liability on Zimmerman. Although it is true that the district court found that Zimmerman was Weinkrantz' superior in business affairs, F.F. 10, 407 F.Supp. at 625, liability would have to be predicated on a finding that Zimmerman used Savoy, not Weinkrantz. Perhaps Zimmerman was able to use his leverage over Weinkrantz to control Savoy, but this speculation falls far short of a finding legally sufficient to impose section 20(b) liability. The bald assertion that "the district court may have premised Zimmerman's violations" on such a theory does not convince us that we can affirm on a section 20(b) theory in the absence of a more thorough explanation.

On the other hand, the Second Circuit has suggested that section 20(a) is available to the Commission in enforcement proceedings. In *SEC v. Management Dynamics, Inc.,* 515 F.2d at 812, the court stated that "[w]e agree with the Commission that with respect to SEC enforcement actions, § 20(a) was not intended as the sole measure of employer liability." Furthermore, the section 20(a) "good faith" defense has been allowed in an SEC injunctive action, as opposed to imposing liability on a *respondeat superior* theory. *SEC v. Lum's, Inc.,* 365 F.Supp. 1046, 1063–64 (S.D.N.Y.1973) ("§ 20(a), and not *respondeat superior,* is the appropriate standard for liability here."); *see* 2 A. Bromberg, Securities Law: Fraud § 7.6(4), at 190.28 n.302 (1977).

Assuming that section 20(a) is available[47] and was implicitly relied upon by the Commission at trial, we still find ourselves unable to affirm this aspect of the district court's opinion because there are no express findings on the defense of good faith and non-inducement. In this case, Zimmerman introduced evidence of his lack of involvement with Savoy and pursued a related argument on appeal. Brief for Appellant at 53–60. Although appellant appears principally to take aim at the district court's determination that he was in control of Savoy, *id.,* non-involvement may well be relevant in the context of the defense explicitly provided by section 20(a).

The Commission maintains that there is effectively an implied finding of the unavailability of the defense because Zimmerman's contentions are "contrary to the good faith standard required by Section 20(a)." Brief of the SEC, Appellee at 51. However, the duty imposed by section 20(a) has been interpreted differently in different contexts.[48] Moreover, the extent and nature of the burden that the plaintiff must bear have also been subject to a wide variety of interpretations.[49] There is, and can

**47.** It is established that the plaintiff need not proceed against the principal perpetrator, nor need the principal perpetrator be identified in the complaint. *See Kemmerer v. Weaver,* 445 F.2d 76, 78–79 (7th Cir. 1971); Folk, *Civil Liabilities Under the Federal Securities Acts: The BarChris Case,* 55 Va.L.Rev. 199, 217–18 (1969).

**48.** *See Zweig v. Hearst Corp.,* 521 F.2d 1129, 1134–35 (9th Cir.), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). *See generally* Note, *The Burden of Control: Derivative Liability Under Section 20(a) of the Securities*

*Exchange Act of 1934,* 48 N.Y.U.L.Rev. 1019 (1973), and cases cited therein.

**49.** *Compare Myzel v. Fields,* 386 F.2d 718, 738 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) (defendant need have no knowledge of specific wrongdoing), *and Zweig v. Hearst Corp.,* 521 F.2d at 1132 (section 20(a) said to create vicarious liability by operation of law except for defense of good faith), *and SEC v. First Secs. Co.,* 463 F.2d 981, 987 (7th Cir.), *cert. denied sub nom. McKy v. Hochfelder,* 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972) (follows liberal *Myzel* definition of control and notes that defendant

be, no doubt under any interpretation that, where section 20(a) is the sole basis for imposing liability, there is a defense available. In any event, where, as here, the statutory basis of the district court's conclusions is subject to some doubt and that doubt is exacerbated by the absence of findings concerning the section 20(a) defense, we think that a remand for further findings in this area is the appropriate course of action.[50] *See Gould v. American-Hawaiian Steamship Co.,* 535 F.2d 761, 780–81 (3d Cir. 1976); *Rochez Bros v. Rhoades,* 527 F.2d 880, 889 (3d Cir. 1975). *See also SEC v. Coffey,* 493 F.2d at 1318 (alternative holding). Additionally, on remand, the district court will need to make an express finding as to primary liability, because, in the context of this case, a finding of liability via control will be a finding of secondary liability.

D. *The Alleged Violations of the Antifraud Provisions*

The final area that we need consider is the district court's conclusions that Zimmerman violated section 17(a) of the 1933 Act, section 10(b) of the 1934 Act, and rule 10b–5 thereunder. To the extent that these antifraud violations are predicated on the Forms 8–K and 10–K, listing application, and letter to stockholders, there must be a remand for further findings. *See* text *supra* at 39–43. However, the district court also found that Zimmerman had violated these antifraud provisions in connection with the Schedule 13D that was filed. C.L. 14, 407 F.Supp. at 630. We are of the view that this aspect of the case also needs to be remanded.

▮ We note initially that there exists no "standing" problem in this case because the SEC is the plaintiff. *SEC v. National Securities, Inc.,* 393 U.S. 453, 467 n.9, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969). Nevertheless, section 10(b) finds application only "in connection with the purchase or sale of any security" and section 17(a) finds application only "in the offer or sale" of any security. At this stage, we are satisfied that section 10(b)'s "in connection with" requirement is satisfied by the filing of the Schedule 13D, coupled with the public trading in Savoy stock. It has been held that this requirement is satisfied whenever it may reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities in reliance thereon, regardless of the motive or existence of contemporaneous transactions by or on behalf of the violator. *SEC v. Texas Gulf Sulfur Co.,* 401 F.2d at 860–61; *accord, Gottlieb v. Sandia American Corp.,* 452 F.2d 510, 516 (3d Cir.), *cert. denied sub nom. Wechsler v. Gottlieb,* 404 U.S. 938, 92 S.Ct. 274, 30 L.Ed.2d 250 (1971).

▮ The "offer or sale" requirement of section 17(a) does not appear to have such a simple application, and its satisfaction in the opinion of the district court is not entirely clear to us. The agreement to have Savoy issue the 172,000 shares came in January 1974, the closing occurred on April 5, 1974, and the Schedule 13D was filed on April 10, 1974. Assuming *arguendo* that this transaction involved one or more "sales" within the meaning of section 17(a),

must establish existence of precautionary measures to demonstrate good faith), *and Richardson v. MacArthur,* 451 F.2d 35, 42 (10th Cir. 1971) (defendant liable as controlling person unless defense contained in "proviso" established), *with Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir. 1973) (en banc) (directors liable as controlling persons only if they are "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons"), *and Gordon v. Burr,* 506 F.2d 1080, 1086 (2d Cir. 1974) (knowledge of fraud or culpable participation required), *and Rochez Bros. v. Rhoades,* 527 F.2d 880, 884–85, 889–91 (3d Cir. 1975) (culpable participation a prerequisite for

liability under section 20(a) and imposition of liability for defendant's inaction only where inaction deliberately furthered fraud or prevented discovery), *and Gould v. American-Hawaiian S. S. Co.,* 535 F.2d 761, 779 (3d Cir. 1976) (section 20(a) defense construed as good faith and lack of culpable participation).

**50.** We do not understand the linkage between the finding of control and the violation of section 17(a). Section 15 of the Securities Act of 1933, 15 U.S.C. § 77*o* (1976), provides expressly for secondary liability of control persons only where the controlled person is liable under section 11 or 12 of the Securities Act of 1933.

see *SEC v. National Securities, Inc.*, 393 U.S. at 466–67, 89 S.Ct. 564; *Dasho v. Susquehanna Corp.*, 380 F.2d 262, 266–67 (7th Cir.), *cert. denied sub nom. Bard v. Dasho*, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967), then the filing of the Schedule 13D came five days *after* the "sale" of the States shares to Savoy and of the Savoy shares to Interstate, Dunlap, and the Mansdorf trust. If the district court predicated its conclusion on this theory, the question becomes whether there was still an "offer" or "sale" in progress on April 10, 1974. This question is essentially factual and particularly suited for resolution in the district court. If, on the other hand, this "offer or sale" requirement is to be satisfied by a post-filing transaction, we cannot find support in the record for the existence of such a transaction.

A third possibility is that the district court believed that the "offer of sale" element was satisfied by the "transformation" of the nature of the Savoy shares. "Whether [an exchange of assets for securities] is a purchase or sale . . . by altering the business of the issuing entity—is still an open question depending on the particular facts." 2 A. Bromberg, *supra* at § 6.5(113), at 134.5. In any event, a remand is in order with respect to the section 17(a) violation because further findings are necessary relative to the "offer or sale" requirement. *See generally SEC v. Penn Central Co.*, 450 F.Supp. 908 (E.D.Pa.1978).

The question of whether scienter is necessary under section 17(a) may ultimately have a different resolution from whether it is necessary under section 10(b). *See, e. g., SEC v. Coven*, 581 F.2d 1020 at 1025–28 (2d Cir. 1978); *SEC v. Texas Gulf Sulfur Co.*, 401 F.2d at 866–68 (Friendly, J., concurring); *SEC v. Southwest Coal & Energy Co.*, 439 F.Supp. 820, 826 (W.D.La.1977); Note, *The Scienter Requirement* in SEC Injunctive Enforcement of Section 10(b) after Ernst & Ernst v. Hochfelder, 77 Colum. L.Rev. 419, 431 & n.72 (1977). *But see SEC v. American Realty Trust Co.*, 429 F.Supp. 1148, 1171 (E.D.Va.1977) (scienter required under section 10(b) and section 17(a)). Because the language of section 17(a) parallels

so closely that of rule 10b–5, *see Ernst & Ernst v. Hochfelder*, 425 U.S. at 213 n.32, 96 S.Ct. at 1390, and because some of the language of rule 10b–5 has been said to suggest the proscription of any type of misstatement or omission regardless of intent, *id.* at 212, 96 S.Ct. at 1390, there is a legitimate and significant doubt as to whether the liabilities to SEC injunctive enforcement under section 17(a) and section 10(b) will be coextensive with regard to scienter. *See SEC v. World Radio Mission, Inc.*, 544 F.2d at 541 n.10. These are important questions, the resolution of which *Ernst & Ernst v. Hochfelder* has made less clear. *Collins Securities Corp. v. SEC*, 562 F.2d at 827; *accord, SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d at 101.

In order to reach an intelligent resolution of the issues, we must have them clearly placed in focus by adequate factual development. Because of the uncertainty regarding the "offer and sale" requirement of section 17(a) and because the district court did not reach a factual resolution as to the presence or absence of scienter, any comment we make may be premature.

### III. CONCLUSION

We affirm the district court with respect to the violations of sections 13(d)(1) and 13(d)(3) of the Securities Exchange Act of 1934, and the rules thereunder. With respect to all other violations, we vacate and remand for a further illumination.

Appellant has raised the scope of the prohibitory language of the second and third paragraphs of the injunction as an issue in this case. The district court's Judgment of Permanent Injunction, 407 F.Supp. at 631, was predicated upon its Findings of Fact and Conclusions of Law. Because there remains doubt as to the existence of some of the violations underlying the injunction, we feel that the issue concerning the proper scope of this language is best considered, if at all, when there is a precise definition of all of the violations. Accordingly, we remand with instructions to the district court to modify the second and

third paragraphs of its injunction *pendente lite,* so as to encompass only the specific violations affirmed on appeal and so as to limit its scope to Savoy.

*So ordered.*